LPD Stuttgart                                                     27.03.07
40-DS/OK-05
Sb. Münch

# Ermittlungsbericht

Ermittlungsverfahren der Staatsanwaltschaft Heilbronn, Az: 21Js27386/05, gegen:

1. **Norbert BISCHOFF, 04.07.1951 in Pforzheim**
   verheiratet, technischer Leiter der Fa. Fakir, Vaihingen/Enz (seit 1999)
   75446 Wiernsheim, Cranachweg 7/3

   Rechtsanwalt: Kanzlei Eisenmann, Wahle, Birk, Stuttgart

2. **Wolfgang BUCHERT, 16.11.1937 in Villingen**

   verheiratet, ehem. kfm. Geschäftsführer der Fa. Fakir, Vaihingen/Enz (2000-12/2002)
   75417 Mühlacker, Götzentor 31

   Rechtsanwalt: Kanzlei Berg, Fanz, Mühlacker

3. **Heinz KICHERER, 23.04.1922 in Stuttgart**

   verheiratet, ehem. Geschäftsführer und Eigentümer der Fa. Fakir, Vaihingen/Enz (1947-08/2005)
   75173 Pforzheim, Hohlbeinstr. 11

   Rechtsanwalt: Kanzlei Ladenburger, Neifeind, Schmücker&Homann, Pforzheim

4. **Rüdiger KURZ, 13.11.1941 in Stuttgart**

   verheiratet, ehem. Geschäftsführer der Fa. Fakir, Vaihingen/Enz (1990-03/1997)
   71229 Leonberg, Landhausweg 3

   Rechtsanwalt: Kanzlei Eisenmann, Wahle, Birk, Stuttgart

5.  **Joachim SÖHN, 28.05.1948**

verheiratet, ehem. Geschäftsführer der Firmen F+P Thermoplast Verarbeitung GmbH, später Simm Kunststofftechnik GmbH (1987-2002)
76764 Rheinzabern (Verbandgemeinde Jockrim), Janusstraße 8

Rechtsanwalt: Bode, Augsburg


wegen Verdachts der fahrlässigen Tötung in 155 Fällen im Zusammenhang mit der Brandkatastrophe am 11.11.2000 am Kitzsteinhorn in Kaprun/Österreich.

Anzeigeerstatter war die Gletscherbahn Kaprun AG, die auf Grund der Ergebnisse der Hauptverhandlung in Salzburg eine entsprechende Strafanzeige vorlegte, worauf die Staatsanwaltschaft Salzburg ein Rechtshilfeersuchen an die Staatsanwaltschaft Heilbronn richtete, da der Firmensitz der Fa. Fakir in Vaihingen/Enz liegt.


**1**
**Einleitung des Ermittlungsverfahrens durch die Staatsanwaltschaft Salzburg**


**1.1**
**Brandkatastrophe am 11.11.2000 am Kitzsteinhorn in Kaprun/Österreich**

Am Vormittag des 11.11.2000 kam es im Tunnel der Standseilbahn am Kitzsteinhorn, die von der Kapruner Gletscherbahn AG betrieben wurde, zu einem Brand im bergwärts fahrenden Zug mit der Bezeichnung „Kitzsteingams", infolge dessen 155 Menschen starben. 12 Fahrgäste konnten sich aus dem brennenden Zug zum Tunneleingang retten.


**1.2**
**Strafverfahren in Österreich**

Die Staatsanwaltschaft Salzburg klagte unter dem Az: 5 St 213/01 i am 23.01.2002 insgesamt 16 Personen wegen fahrl. Herbeiführung einer Feuersbrunst gem § 170 österr. StGB und der fahrl. Gemeingefährdung gem. § 177 österr. StGB an.

Bei den Angeklagten handelte es sich um

- Verantwortliche der Gletscherbahn Kaprun AG
- Verantwortliche der Fa. Swoboda Karosserie – und Stahlbau GesmbH (zuständig für den Umbau der Standseilbahn in den Jahren 1993/1994)
- Mitarbeiter der Fa. Mannesmann-Rexroth (zuständig für die Hydraulikanlage in den umgestalteten Zügen)
- Beamte des Bundesministeriums für Verkehr, Innovation und Technologie (zuständig für das eisenbahnrechtliche Bewilligungsverfahren

2

- Mitarbeiter des TÜV Österreich (zuständig für erforderliche Überprüfungen)

Alle Angeklagten wurden am 19.02.2004 durch das Landesgericht Salzburg, Az: 37 Hv 60/02 d, von den jeweiligen Vorwürfen frei gesprochen. Die Berufungsinstanz bestätigte diesen Freispruch.

*Quelle:*
- *Urteil des Landesgericht Salzburg, Az: 37 Hv 60/02 d v. 19.02.2004, Seiten 1-372 (siehe Ordner: Urteil LG Salzburg)*

## 1.3
## Ergebnis der Beweisaufnahme – Sachverständige - Begründung des Freispruchs

Das Gericht kam zu dem Ergebnis, dass der im talseitigen Führerstand des Zuges eingebaute Heizlüfter Hobby TLB der Fa. Fakir den Brand ausgelöst hat.

Dabei stützte sich das Gericht im Wesentlichen auf die Gutachten folgender gerichtlich beauftragter österreichischen Sachverständigen:

- Universitätslektor Ing. Helmut Prader, 19.09.37, Geschäftsführer der Tiroler Landesstelle für Brandverhütung i.R., lt. Gerichtssachverständigenliste Sachverständiger für Brandermittlung, Brandschutzwesen und Feuerpolizei mit Ausnahme Rauchfangkehrarbeiten
- Univ.Prof. Dipl.-Ing. Dr. mont. Karl L. Maurer, 04.03.27, Hochschulprofessor an der Universität Leoben, lt. Gerichtssachverständigenliste Sachverständiger für Zivilschutz (Strahlenschutz) und Metallische Werkstoffe, ihre Untersuchung und Prüfung
- DI Mag. Udo Geishofer, 02.10.40, Professor an der Höheren Technischen Bundeslehr- und Versuchsanstalt, lt. Gerichtssachverständigenliste Sachverständiger für Verkehrssicherheit (Straßenverkehr insbes. Kfz), Kfz-Reparaturen und Havarieschäden inkl. Bewertung, Mikroprozessoren (digitale Kleinrechenanlagen) u. Programmierung digitaler Systeme (Software

Nach deren Gutachten wies der eingebaute Heizlüfter Hobby TLB der Fa. Fakir sowohl Konstruktions- als auch Produktionsmängel auf. Im Einzelnen wurde festgestellt, dass

- der Abstand zwischen Heizstern und dem Kunststoffgehäuse mit 1cm für die entstehenden Temperaturen von 600 °C zu gering ist
- der verwendete Kunststoff nicht selbst verlöschend ist
- bei der Herstellung der Kunststoffgehäuse Fehler gemacht wurden, indem der Anspritzpunkt falsch gewählt wurde. Die Befestigungslöcher (sog. Schraubdome) befinden sich genau an einer Bindenaht, die eine Schwachstelle darstellt. Dadurch entstanden in der Folge Ermüdungsbrüche, die zum Abkippen der Heizeinheit und zum Kontakt des Heizsterns mit dem Kunststoffgehäuse führten. Dieser Kontakt verursachte letztendlich den Brand des gesamten Heizlüfters. Die dabei entstandenen Temperaturen führten zum Bersten der Hydraulikmessleitungen, so dass

das unter sehr hohem Druck stehende Hydrauliköl explosionsartig entzündet wurde.

*Quelle:*

- *Urteil Landesgericht Salzburg, Az: 37 Hv 60/02 d, Seiten 92, 154-159, 161, 166 (siehe Ordner: Urteil LG Salzburg)*


**1.4**
**Weitere Sachverständige im österreichischen Verfahren**

Neben den bereits erwähnten Sachverständigen waren noch mehrere andere Sachverständige von der Untersuchungsrichterin und dem Gericht beauftragt, in dieser Sache Gutachten zu erstellen, darunter auch Herr Anton Muhr, 06.06.42, Autoelektriker, lt. Gerichtssachverständigenliste Sachverständiger für Werkzeugspuren (Einbruchspuren, Diebstahlschäden bei Fahrzeugen und fahrbaren Arbeitsmaschinen), Brand- und Explosionsermittlung (Brandermittlung – Brandschäden bei Fahrzeugen und fahrbaren Arbeitsmaschinen) und Kraftfahrzeugelektronik, insbesondere Car-Area-Networks (nur für Autoelektronik)

Herr Muhr kam in seinem schriftlichen Gutachten zu einem anderen Ergebnis wie die Sachverständigen Prader, Geishofer und Maurer. Für ihn lag die wahrscheinliche Ursache der Brandkatastrophe an der seiner Auffassung nach unverantwortlichen Nähe von Heizlüfter zu Hydraulikölleitungen und einer Undichtigkeit des Hydrauliksystems, insbesondere im Bereich der Messleitungen. Entweichendes Hydrauliköl setzte sich auf das Gehäuse des Heizlüfters ab und wurde durch das Lüfterrad in das Innere des Heizlüfters eingesaugt. Durch die Belastung mit Hydrauliköl kam es zu einem Defekt des Heizlüfters, der dann in Brand geriet. Die Richtigkeit seines Gutachtens begründete Anton Muhr u.a. mit von ihm und weiteren DEKRA-Mitarbeitern festgestellten Ölantragungen im Bereich des Heizlüfters im talseitigen Führerstand des nicht abgebrannten Gegenzuges und im Heizlüfter selbst.

Eine solche Belastung mit Hydrauliköl wurde vom Gericht nie festgestellt. Das Gericht führte Ölbelastungen auf später durchgeführte Versuche durch verschiedene Sachverständige zurück, zum Zeitpunkt des Ausbaus habe der Heizlüfter aus dem nicht verbrannten Zug keinerlei Ölanhaftungen aufgewiesen. Das Gericht bezog sich dabei auf die von der KTZ gefertigten Bilder.

*Quelle:*

- *Gutachten Muhr v. 30.08.2001, Zusammenfassung Seiten 69-72 (siehe Ordner: Gutachten)*
- *Urteil des Landesgericht Salzburg, Az: 37 Hv 60/02 d v. 19.02.2004, Seiten 119, 122, 157, 179, 209, 241, 249, 251 (mit Verweis auf Bilder der KTZ), 252, 256, 297/303/304 (Hinweis auf Feststellungen der KTZ), 305*


Zu diesen Bildern wird auf die Ausführungen im Abschnitt 6.9 verwiesen.

Herr Muhr schied krankheitshalber aus dem Prozess aus, noch bevor er sein Gutachten einbringen konnte. Das Gericht beauftragte deshalb einen neuen

Sachverständigen mit der Erstellung eines Gutachtens zur Brandentstehung.

Die beteiligten Sachverständigen stimmten in dem Punkt überein, dass das Bersten der Hydraulikleitungen eine Sekundärfolge des Heizlüfterbrandes war. Der Unterschied liegt in der Begründung für die Brandentstehung am Heizlüfter.

## 1.5
**Vernehmung von Fakir-Mitarbeitern bei der Hauptverhandlung am 11.09.2002 in Salzburg als Zeugen – Strafanzeige gegen diese Zeugen wegen Verdachts der Falschaussage und fahrl. Herbeiführung einer Feuersbrunst – Rechtshilfeersuchen der StA Salzburg zur Vernehmung der Beschuldigten**

Das Landesgericht Salzburg lud einen Verantwortlichen der Fa. Fakir zum Prozess als Zeuge vor. Der Firmengründer und jetzige Beschuldigte Kicherer sandte seinen damaligen kaufmännischen Geschäftsführer Buchert und den technischen Leiter Bischoff nach Salzburg, um die Fragen des Gerichts zu beantworten.

Aus dem Protokoll der Hauptverhandlung kann geschlossen werden, dass beide Zeugen unvorbereitet in diese Verhandlung gingen. So machte Herr Buchert Angaben zu technischen Fragen, die er nicht sachgerecht beantworten konnte.

Ausschlaggebend für die Strafanzeige der Gletscherbahn Kaprun AG gegen die beiden Zeugen Buchert und Bischoff waren folgende Punkte:

- beide Zeugen konnten dem Gericht die Frage nicht beantworten, aus welchen Gründen der Heizlüfter Hobby TLB nicht in Fahrzeuge eingebaut werden darf und warum dies so in die Bedienungsanleitung aufgenommen wurde
- beide Zeugen widersprachen der Behauptung der österreichischen Sachverständigen, dass der Heizlüfter Hobby S (Anm.: Nachfolgemodell des Hobby TLB) eine technische Neukonstruktion sei, weil man die technischen Mängel des Hobby TLB seitens der Fa. Fakir erkannt hätte. Die Zeugen gaben an, dass beim Hobby S lediglich die Gehäuseform geändert wurde, die Technik aber die gleiche geblieben sei. Die am Hobby TLB angebrachten Abstandshalter für die Wandaufhängung seien durch eine Änderung im Design des Hobby S ersetzt worden. Das Gehäuse des Hobby S übernimmt nun die Funktion eines Abstandshalters bei einer Wandaufhängung. Deshalb wuchs der Abstand des Heizsterns zum Gehäuse auf 5 cm an.
- beide Zeugen behaupteten, der beim Bau der Kunststoffgehäuse verwendete Kunststoff sei selbst verlöschend, was lt. Urteilsbegründung durch die Gutachten der Sachverständigen im Prozess widerlegt worden ist.

Mit Ersuchen der StA Salzburg v. 19.10.05 wurde die StA Heilbronn gebeten, die beiden Beschuldigten Buchert und Bischoff zu den in der Strafanzeige erhobenen Vorwürfen zu vernehmen.

*Quelle:*

- *Protokoll der HV v. 11.09.2002, Seiten 70-145 (siehe Ordner: Protokolle der Hauptverhandlung, Band 1-5)*
- *Strafanzeige der Gletscherbahn Kaprun AG v. 19.01.2004 gegen die Beschuldigten Buchert und Bischoff (siehe Ordner: Ersuchen der StA Salzburg um Übernahme der Strafverfolgung)*

- *Rechtshilfeersuchen der StA Salzburg v. 19.10.2005 – Ersuchen um Vernehmung der Beschuldigten Buchert und Bischoff (siehe Ordner: Rechtshilfe, Band 1, Reg. 1)*

**1.6**
**Ersuchen der StA Salzburg um Übernahme der Strafverfolgung der Beschuldigten Buchert und Bischoff wegen fahrl. Herbeiführung einer Feuersbrunst (§§ 169,170 österr. StGB)**

Mit Schreiben v. 23.11.2005 ersuchte die Staatsanwaltschaft Salzburg die Staatsanwaltschaft Heilbronn, die Strafverfolgung in der Strafsache (Landesgericht Salzburg 46 UR 35/04a) gegen die Beschuldigten Buchert und Bischoff zu übernehmen.

Das Ermittlungsverfahren gegen die beiden Beschuldigen wegen Verdachts der Falschaussage verblieb im Zuständigkeitsbereich der Staatsanwaltschaft Salzburg.

Die Staatsanwaltschaft Heilbronn weitete das Ermittlungsverfahren auf insgesamt 5 Beschuldigte aus. Bei den drei hinzugekommenen Beschuldigten handelt es sich um den Eigentümer und gleichzeitigen Geschäftsführer der Fa. Fakir, einen weiteren Geschäftsführer der Fa. Fakir, sowie den Geschäftsführer der Fa. Simm (Fertigung der Kunststoff-Gehäuse). Diese Beschuldigten waren zum Zeitpunkt der Fertigstellung des Heizlüfters aus dem nicht verbrannten Gegenzug – Oktober 1993 – die Verantwortlichen in den jeweiligen Firmen.

Bei ersten Ermittlungen bzgl. der Fa. Fakir stellte sich heraus, dass die Firma zum 01.07.2005 verkauft worden war. Die neuen Gesellschafter sicherten für das Ermittlungsverfahren ihre Unterstützung zu.

**2**
**Einzelheiten zum eingebauten Heizlüfter**

**2.1**
**Zustand des verbrannten Zuges**

Der in Brand geratene Zug „Kitzsteingams" ist komplett abgebrannt. Es konnten in dem talseitigen Führerstand keine Teile des eingebauten Heizlüfters gefunden werden. Aus diesem Grund gingen die Kriminaltechniker, die Ermittlungsbeamten, die Sachverständigen, die Staatsanwaltschaft und das Gericht bei der Untersuchung und Beurteilung des Sachverhaltes von den baulichen Verhältnissen des talseitigen Führerstandes des nicht verbrannten Gegenzuges

aus, wobei das Gericht in der Hauptverhandlung feststellte, dass die beiden Züge in ihrem Aufbau nicht identisch waren, die Unterschiede aber nicht genau festgestellt werden konnten. Unterschiede sind vor allem bei den Hydraulikölleitungen gegeben.

*Quelle:*

- *Urteilsbegründung* Landesgericht Salzburg, Az: 37 Hv 60/02 d*, Seiten 114-115 (siehe Ordner: Urteil LG Salzburg)*

In den bergseitigen Führerständen waren die ursprünglich eingebauten Heizlüfter Hobby TLB gegen Heizlüfter der Marke Stiebel Eltron ausgetauscht worden. Der Austausch fand zu unterschiedlichen Terminen, aber jeweils im Frühjahr 2000 statt.

*Quelle:*

- *Urteilsbegründung* Landesgericht Salzburg, Az: 37 Hv 60/02 d*, Seite 119 (siehe Ordner: Urteil LG Salzburg)*

Aus den vorliegenden Ermittlungs- bzw. Gerichtsakten geht nicht hervor, ob Ermittlungen zum Verbleib der ausgetauschten Heizlüftern Hobby TLB angestellt wurden.

## 2.2
## Herstellungsdaten und Artikelnummern der eingebauten Heizlüfter Hobby TLB der Fa. Fakir in beiden Zügen – zusätzlich gekaufte Thermostate für die Heizlüfter Hobby TLB

Die Hauptverhandlung in Salzburg hat ergeben, dass die Fa. Swoboda im Rahmen des Umbaus der beiden Züge 4 Fakir-Heizlüfter des Modells Hobby TLB in die Führerstände eingebaut hat.

Nach ursprünglichen Planungen sollten Heizlüfter der Marke „Domo" eingebaut werden, weil solche Heizlüfter bereits in der Festungsbahn in Salzburg eingebaut und für diesen Einbau genehmigt waren.

Die Fa. Höller konnte als Großhändler solche Geräte für die Fa. Swoboda nicht liefern und bestellte daher die ihrer Meinung nach vergleichbaren Heizlüfter der Fa. Fakir.
Es konnte in der Hauptverhandlung nicht geklärt werden, welcher Mitarbeiter der Fa. Swoboda die vier Heizlüfter Hobby TLB in die vier Führerstände eingebaut hat. Weiter konnte nicht geklärt werden, ob die Fa. Höller die Heizlüfter originalverpackt und mit Bedienungsanleitung geliefert hat. Auf diesen Punkt wird an anderer Stelle noch intensiver eingegangen werden.

*Quelle:*

- *Urteilsbegründung* Landesgericht Salzburg, Az: 37 Hv 60/02 d*, Seiten 89, 90 (siehe Ordner: Urteil LG Salzburg)*

- *Rechnung der Fa. Höller an die Fa. Swoboda. 10.03.1994 über die Lieferung von vier Heizlüfter Hobby TLB im Gesamtwert von 2703 ÖS – ON4387 der KTZ-Akte (siehe Ordner: Kopien Gerichtsakten – KTZ Unterlagen)*

Dipl.-Ing. Tisch, KTZ Wien (Kriminaltechnische Zentralstelle, jetzt BKA Wien) ordnete am 14.11.2000 die Sicherstellung des im talseitigen Führerstand des nicht verbrannten Gegenzuges eingebauten Heizlüfter Hobby TLB mit der Gerätenummer 55 13 006 7310 an. Dieser Heizlüfter wird bei der LPD Stuttgart unter der Asservatennummer LGS 1 geführt.

**(LGS=Landesgericht Salzburg als Hinweis, dass dieses Beweismittel vom Landesgericht Salzburg übergeben wurde**)

7310 ist die Verschlüsselung des Herstellungsjahres und bedeutet Oktober 1993.

*Quelle:*
- *E-mail Fa. Fakir, Herr Bernd Schmid v. 17.01.2006 an die LPD Stuttgart mit Erläuterungen zur Entschlüsselung der Typenschilder (siehe Ordner: Fakir)*
- *Gutachten Geishofer v. 13.10.2003, Seite 84 – Aufnahme des Typenschildes, Beschreibung der Entschlüsselung (siehe Ordner: Gutachten)*

Der Heizlüfter wurde gem. Weisung von Dipl.-Ing. Tisch von Mitarbeitern der Gletscherbahn Kaprun AG ausgebaut, wobei eine der Gehäuseschrauben verloren ging.

*Quelle:*
- *Protokoll Hauptverhandlung v. 16.07.02, Vernehmung Georg Kellner, Seite 160 – Ausbau durch Kellner und Steiner (siehe Ordner: Protokolle der Hauptverhandlung)*
- *VN Georg Kellner v. 17.05.2006 in Kaprun, Seite 3 (siehe Ordner: Zeugen)*
- *VN Dipl.-Ing. Bind, BKA Wien, v. 04.10.2006, Seite 4 (siehe Ordner: Zeugen)*

Bezüglich der restlichen drei in den Zügen eingebauten Heizlüfter ergeben sich aus den Gerichts- und Ermittlungsakten keinerlei Hinweise auf die jeweilige Artikelnummer, so dass nicht fest steht, ob die Gehäuseteile aller eingebauten Heizlüfter unter gleichen Bedingungen produziert und die Heizlüfter insgesamt am gleichen Tag endmontiert wurden. Auch auf der Rechnung der Fa. Höller finden sich keine diesbezüglichen Angaben.

Die Hauptverhandlung in Salzburg hat ergeben, dass der Zeuge Franz Holzinger, 20.11.55, zum Zeitpunkt des Umbaus der Züge Abteilungsleiter als Werkmeister bei der Fa. Swoboda, die Heizlüfter selbst bei der Fa. Höller abgeholt hat. Er glaubt, dass er zuerst nur zwei bekommen hat und dass dann noch zwei Heizlüfter

nachgeliefert wurden. Einzelheiten dazu konnte er nicht angeben, er wusste auch nicht, ob die Heizlüfter original verpackt waren und ob Bedienungsanleitungen beilagen

Diese Aussage bedeutet, wenn sie der Wahrheit entspricht, dass es völlig ungeklärt ist, welche Artikelnummern die drei nicht identifizierten Heizlüfter Hobby TLB gehabt haben. Aufgrund der Tatsache, dass zunächst nur zwei Geräte lieferbar waren, muss davon ausgegangen werden, dass es sich dabei um bereits im Lager vorrätige Geräte gehandelt hat. Die beiden fehlenden Geräte mussten wohl nachbestellt werden. Daher ist es sehr unwahrscheinlich, dass alle vier Heizlüfter im Oktober 1993 in Vaihingen/Enz zusammengebaut worden sind. Es ist auch nicht klar, wer wann welchen Heizlüfter in welchen Führerstand eingebaut hat. Diesbezüglich fanden sich in den Gerichtsakten keine Aufzeichnungen. Denkbar wäre es, dass die zwei zuerst gelieferten Heizlüfter in einem anderen Jahr als die später nachgelieferten Geräte zusammengebaut wurden.
Aus den Gerichtsunterlagen geht nicht hervor, dass Ermittlungen zum Produktionszeitpunkt und zur Artikelnummer der 4 Heizlüfter angestellt wurden.

*Quelle:*
- *Protokoll Hauptverhandlung v. 18.07.02, Vernehmung Franz Holzinger, Seite 18-20, 24, 41, 44, 65 (siehe Ordner: Protokolle der Hauptverhandlung)*

In den KTZ-Akten befindet sich die Rechnung Nr. 5035053 der Fa. Höller v. 10.03.94 an die Fa. Swoboda über den Kauf von 4 Heizlüftern Hobby TLB zum Preis von 2703,00 ÖS inkl. MwSt. In der Rechnung wird auf den Lieferschein Nr. 618021 v. 01.03.94 Bezug genommen, der allerdings in den Gerichtsakten nicht festgestellt werden konnte.

Im Gegensatz zur Aussage des Zeugen Holzinger würde dies aber bedeuten, dass alle 4 Heizlüfter mit einem Lieferschein an die Fa. Swoboda geliefert wurden. Ein weiterer Widerspruch zu den im Prozess gemachten Angaben ist der Umstand, dass auf der Rechnung Bezug auf die Bestellung Nr. 69/94 v. 01.03.94 Hr. Holzinger genommen wird.

Danach hat Herr Holzinger möglicherweise selbst die Heizlüfter Fakir Hobby TLB bestellt und nicht, wie im Urteil festgestellt wurde, die Einkaufsabteilung der Fa. Swoboda.

*Quelle:*
- *Urteilsbegründung* Landesgericht Salzburg, Az: 37 Hv 60/02 d*, Seite 60/61 (siehe Ordner: Urteil LG Salzburg)*

In den KTZ-Akten befindet sich auch ein Lieferschein der Fa. Swoboda v. 26.08.94, Auftrag: 2227 KB, über 4 Thermostate für Heizlüfter mit der Nummer 143211. Dabei handelt es sich um die Thermostate, wie sie im Heizlüfter Hobby TLB eingebaut waren. Diese Thermostate konnten nicht gleichzeitig geliefert werden. 2 Stück wurden am 01.09.94, 2 Stück in der 40. KW an die Gletscherbahn Kaprun AG geliefert.

Möglicherweise verwechselte der Zeuge Holzinger hier Heizlüfter mit Thermostaten.

Es stellt sich die Frage, warum die Gletscherbahn Kaprun AG sich von der Fa. Swoboda 4 weitere Thermostate für die Heizlüfter Hobby TLB liefern ließ. Dieser Frage wurde in dem österreichischen Verfahren, soweit hier bekannt, nicht nachgegangen.

*Quelle:*

- *ON 4387, Ordner 9 KTZ Wien (siehe Ordner: Kopien Gerichtsakten, KTZ Unterlagen)*
- *ON 4051 und 4053 (siehe Ordner: Kopien Gerichtsakten, KTZ Unterlagen)*
- *Protokoll Hauptverhandlung v. 18.07.02, Vernehmung Franz Holzinger, Seite 18-20, 24, 41, 44, 65 (siehe Ordner: Protokolle der Hauptverhandlung)*
- *Mitteilung der Fa. Fakir v. 28.02.07 mit Schaltplänen des Thermostats mit der Bestell-Nr. M-143211.220 (siehe Ordner: Fakir)*


Neben dem Typenschild mit der Artikelnummer findet sich jeweils auf dem hinteren Teil des Kunststoffgehäuses der Heizlüfter Hobby TLB, unterhalb des Griffes, ein Prägestempel. Dieser Stempel ist im Spritzgusswerkzeug enthalten und soll den Herstellungsmonat für das Kunststoffgehäuse zeigen. Auf dem ausgebauten Heizlüfter ist der Monat 11/89 abzulesen. Zunächst entstand daher der Eindruck, das Gehäuse hätte eine jahrelange Lagerzeit hinter sich gebracht, bevor es im Oktober 1993 bei der Fa. Fakir zu einem Heizlüfter zusammengebaut wurde.

Die Gehäuseteile für den Heizlüfter Hobby TLB wurden in der Zeit von 1985 – 1995 ausschließlich bei der Fa. Simm, damals in Karlsruhe, hergestellt.

Das zum Spritzguss verwandte Werkzeug ist bei der Fa. Fakir noch vorhanden und zeigt auch heute noch den Stempel 11/89. Diese Datumsanzeige scheint „festgefressen", zumindest war es auch mit großer Kraftanstrengung nicht möglich, dieses Datum zu ändern.

Daher ist es nicht möglich, auf Grund dieses Stempels Rückschlüsse auf den Herstellungsmonat des hinteren Gehäuseteils des Heizlüfters aus dem nicht verbrannten Zug zu ziehen.

Im österreichischen Strafverfahren wurden zu diesem Prägestempel keine Ermittlungen geführt.

*Quelle:*

- *Lichtbilder v. 17.07.2006 der LPD Stuttgart vom Spritzgusswerkzeug (siehe Ordner: Fakir)*
- *AV LPD Stuttgart v. 17.07.2006 (siehe Ordner: Fakir)*
- *Schreiben der Fa. Fakir v. 12.06.2006, Herr Bernd Schmid. Beantwortung eines Fragekatalogs v. 05.04.2006 (siehe Ordner: Fakir)*

**2.3**
**Einbausituation im talseitigen Führerstand**

Die Heizlüfter waren in einem Ausschnitt eines 2mm starken Blechs so eingebaut, dass das vordere und hintere Teil des Gehäuses auf dem Blech auflag. Dabei ging die Dichtfunktion, die ursprünglich durch Nut und Feder gegeben war, verloren. Das Gerät war nicht mehr tropfwassergeschützt.

Der Netzstecker war in einer im Bodenraum installierten Steckdose (220 V) eingesteckt. Die Verbindung des Führerstandes mit dem Stromnetz kam erst bei Einfahrt in die Tal- bzw. Bergstation durch ein entsprechendes Anschlussstück zustande. Während der Fahrt bestand keine Verbindung zum Stromnetz. Die Heizlüfter heizten demnach ausschließlich in der Tal- bzw. Bergstation, wenn der Zugbegleiter den Heizlüfter auch angeschaltet hatte. Die Einschaltung erfolgte entweder direkt am Heizlüfter oder an einem Schalter am Bedienpult.

Hinter dem Heizlüfter verliefen Hydraulikmessleitungen, die im talseitigen Führerstand zu insgesamt 3 Manometern führten. Diese Messleitungen waren aus Kunststoff.

Da die Zugbegleiter unmittelbar nach Auslieferung der Züge über Zugluft klagten, wurde von einem Mitarbeiter der Gletscherbahn Kaprun AG ohne Wissen der Verantwortlichen ein so genannter Holzverhau aus Lärchenholz eingebaut. Ritze wurden mit Mineralwolle ausgestopft.

Unterhalb des Heizlüfters war im Blech eine so genannte Lufthutze eingebaut.

Die Einbausituation ist aus den zahlreichen Bildern der KTZ und des Sachverständigen Muhr bzw. dessen Mitarbeiter Lange von der DEKRA Stuttgart dokumentiert.

*Quelle:*
- *Lichtbilder KTZ – CD Asservatennummer LGS 10, LGS 20, LGS 21, LGS 22, CD DEKRA, am 15.02.06 von Herrn Lange mit Schreiben v. 10.02.2006 übersandt*
- *Gutachten Muhr v. 30.08.2001 (siehe Ordner: Gutachten)*
- *Gutachten Wagner zur Hydraulikanlage (siehe Ordner: Gutachten)*
- *Bericht LKA Salzburg, AB 07 – Tatort, v. 08.02.2006. Herr Nimmrichter hat auf Weisung des Landesgerichts Salzburg für die StA Heilbronn die Einbausituation nochmals vermessen und fotografiert (siehe Ordner: Rechtshilfe, Band 1, Reg. 3)*

**3.**
<u>**Ermittlungen im österreichischen Verfahren**</u>

**3.1**
**Beteiligte Stellen**

Mit Ermittlungen zur Brandursache waren die folgenden Stellen beteiligt:

- die Untersuchungsrichterin beim Landesgericht Salzburg, Frau Magister Rohan-Achammer
- die Staatsanwältin Frau Dr. Danninger-Soriat, Staatsanwaltschaft Salzburg
- der Richter Dr. Manfred Seiss, Landesgericht Salzburg
- das Landesgendarmeriekommando Salzburg – Herr Maj. Lang als Leiter der Ermittlungseinheit – zuständig für die Ermittlung des Sachverhaltes
- die Kriminaltechniker der KTZ Wien, jetzt BKA Wien

- die Kriminaltechniker des Landesgendarmierkommandos Salzburg – zuständig für den Bereich Leichenbergung und Identifizierung

Anders als in der Bundesrepublik Deutschland kommt der Staatsanwaltschaft in der Republik Österreich keine die Ermittlungen leitende Funktion zu. Diese Funktion übernimmt im ersten Angriff ein Untersuchungsrichter, später der mit dem Fall befasste Richter.

**4**
**Gerichtsakten, Ermittlungsakten und Beweismittel, die vom Landesgericht Salzburg der Staatsanwaltschaft Heilbronn zur Verfügung gestellt wurden**

**4.1**
**Gerichtsakten**

In der Zeit v. 07.03.2006 – 09.03.2006 konnten beim Untersuchungsrichter des Landesgerichts Salzburg, Dr. Nocker, die Gerichtsakten durchgesehen werden. Die Durchsicht wurde von Herrn OStA Schwarz von der Staatsanwaltschaft Heilbronn und KHK Münch, LPD Stuttgart durchgeführt. Die für das Verfahren der Staatsanwaltschaft Heilbronn notwendig erscheinenden Akten wurden auf Ersuchen von OStA Schwarz kopiert. Diese Kopien wurden am 03.05.2006 von ChefInsp. Wieland in Bad Reichenhall an die LPD Stuttgart übergeben.

Diese Unterlagen wurden aufgelistet und ausgewertet.

*Quelle:*
- *Auflistung der übergebenen Akten v. 04.05.2006 (siehe Ordner: Kopien Gerichtsakten Band 1)*
- *Auswertung der übergebenen Akten v. 14.06.2006 – es sind nur die im Zusammenhang mit dem Heizlüfter relevanten Aktenteile aufgeführt (siehe Ordner: Kopien Gerichtsakten Band 1)*

**4.2**
**Übergebene Beweismittel**

Am 09.03.06 wurden vom Landesgericht Salzburg die von der Staatsanwaltschaft Heilbronn angeforderten Beweismittel übergeben.

Bei der Auswertung dieser Beweismittel bei der LPD Stuttgart stellte sich das Fehlen wesentlicher Teile heraus, insbesondere fehlten gerade die Teile, die lt. Gutachten der Sachverständigen Maurer und Geishofer das Vorhandensein von Produktions- und Konstruktionsfehler beim Heizlüfter Hobby TLB belegen.

Bei den fehlenden Beweismitteln handelt es sich um:

- den so genannten Befestigungsdom des Heizlüfters aus dem nicht verbrannten Gegenzug, Asservatennr. LGS 1
- eine Schraube mit einem abgebrochenen Gehäuseteil aus Kunststoff des Heizlüfters LGS 1
- den Heizlüfter Hobby TUB, Artikelnummer 55 06 006 7406. Dieser Heizlüfter wird vom Sachverständigen Geishofer auf Seite 89 seines Gutachtens v. 13.10.03 beschrieben. Auf Seite 91 zeigt er das Bild eines Risses im Befestigungsdom (Abb. 49). Der Heizlüfter war von der KTZ bei der Fa. Fakir beschafft worden. Lt. Übergabeliste des Landesgerichts Salzburg müsste es sich bei dem als  PZ 2 (bei LPD Stuttgart LGS 4) bezeichneten Gerät um diesen Heizlüfter handeln. Tatsächlich wurde ein Heizlüfter Hobby TLB übergeben, an dem keine Artikelnummer mehr erkennbar ist. Lt. Gutachten Maurer zeigt der gesuchte Heizlüfter 55 06 006 7406 die gleichen Risse im Befestigungsdom wie der Heizlüfter LGS 1 aus dem nicht verbrannten Gegenzug und wurde als Beweis für das Vorliegen von Konstruktions- und Produktionsmängel beschrieben
- Teile des Befestigungsdomes des Heizlüfters Hobby TLB – auch Glaser alt genannt. Dieser Heizlüfter führt bei der LPD Stuttgart die Asservatennummer LGS 3, PZ 4 beim Landesgericht Salzburg. Im Gutachten Geishofer v. 13.10.2003 werden auf den Seiten 106 und 107 die Abbildungen 157 und 159 gezeigt. Dabei handelt es sich um Bruchstücke des Befestigungsdomes. Diese Bruchstücke wurden am 09.03.06 nicht übergeben. Lt. Gutachten Geishofer beweisen diese Bruchstücke das Vorhandensein von Produktions- und Konstruktionsfehlern.

Der Verbleib dieser Beweismittel konnte noch nicht geklärt werden.

*Quelle:*
- *Bericht LPD Stuttgart v. 13.03.06 – Auflistung der vom Landesgericht Salzburg empfangenen Beweismitteln (siehe Ordner: Asservate Salzburg)*
- *Schreiben der StA Heilbronn v. 28.03.2006 an den Untersuchungsrichter beim Landesgericht Salzburg, Herrn Dr. Nocker – Mitteilung über fehlende Beweismittel, u.a. (siehe Ordner Rechtshilfe, Band 1, Reg. 2)*
- *Schreiben des Untersuchungsrichters Dr. Nocker an den Sachverständigen Geishofer v. 24.04.06, Az: 46 Hs 16/05 – Anfrage zum Verbleib von wesentlichen Beweismitteln (siehe Ordner Rechtshilfe, Band 1, Reg. 2)*
- *Schreiben des Untersuchungsrichters Dr. Nocker an den Sachverständigen Maurer v. 24.04.06, Az: 46 Hs 16/05 – Anfrage zum Verbleib von wesentlichen Beweismitteln (siehe Ordner Rechtshilfe, Band 1, Reg. 2)*

Die Sachverständigen Geishofer und Maurer, sowie Herrn Maurers Mitarbeiter Mori konnten am 21./22.11.06 in Graz bzw. Leoben auch zu diesen Punkten vernommen werden. Sie machten keinerlei Angaben, die zum Auffinden dieser

Beweismittel führen konnten.

Herr Prof. Langecker konnte am 03.01.07 in Köln vernommen werden. Er gab an, er habe keine Teile des Heizlüfters aus dem nicht verbrannten Gegenzug sondern Teile eines Hobby TUB untersucht. Die fehlenden Teile habe er nicht gesehen.

*Quelle:*
- *Vernehmung Prof. Maurer am 21.11.06 in Leoben (siehe Ordner: Zeugen)*
- *Vernehmung Prof. Mori am 21.11.06 in Leoben (siehe Ordner: Zeugen)*
- *Vernehmung Prof. Langecker am 03.01.07 in Köln (siehe Ordner: Zeugen)*
- *Vernehmung Mag. Geishofer am 22.11.06 in Graz (siehe Ordner: Zeugen)*
- *Schriftverkehr zwischen dem Untersuchungsrichter beim Landesgericht Salzburg, Dr. Nocker und den Sachverständigen Maurer und Geishofer (siehe Ordner: Rechtshilfe, Band 1)*

Bei den Vernehmungen bestätigte sich die bereits bei Auswertung der Akten ersichtliche Nachlässigkeit im Umgang mit Beweismitteln. Die befragten Sachverständigen bestätigten zwar, mit den Beweismitteln gearbeitet zu haben, jedoch wurden Beweismittel unter den Sachverständigen und von den Sachverständigen zum Gericht ohne entsprechende Belege weitergereicht.

**Somit standen der Staatsanwaltschaft Heilbronn die wichtigsten Beweismittel aus Österreich nicht zur Beurteilung des Sachverhaltes zur Verfügung und konnten auch nicht den von der Staatsanwaltschaft Heilbronn beauftragten Sachverständigen beim Deutschen Kunststoff Institut in Darmstadt und dem Kriminaltechnischen Institut beim Landeskriminalamt Baden-Württemberg in Stuttgart für entsprechende Untersuchungen zur Verfügung gestellt werden.**

Das Gericht in Salzburg selbst äußerste sich im Urteil zum Umgang mit wichtigen Beweismitteln während der Ermittlungsphase:

„….wurde in der Hauptverhandlung in teilweise auch für den Verhandlungsrichter erschreckenden Weise deutlich, wie mit diesen zweifellos wichtigen Beweismitteln verfahren worden ist. Es wurden die Gegenstände ohne jede Sicherung und ohne Verpackung oder Verschweißung im Vergleichszug am Boden über einen längeren Zeitraum  hinweg belassen …."

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 208 (zu den zentralen Gegenständen aus dem Gutachten Muhr – Holzbretter, Steinwolle (siehe Ordner: Urteil LG Salzburg)*

## 4.3
## Weitere beim Landesgericht Salzburg vorhandene Heizlüfter

In der Struber-Kaserne in Salzburg, wo auch die beiden Züge der Standseilbahn sichergestellt sind, lagerten mehrere Fakir-Heizlüfter und deren Verpackungen. Die Heizlüfter zeigen alle Spuren thermischer Belastungen. Aus den Ermittlungs-

und den Gerichtsakten geht nicht hervor, ob an diesen Heizlüftern beweisrelevante Spuren vorhanden sind, oder ob diese Heizlüfter lediglich für die durchgeführten Brandversuche angeschafft wurden. In der Hauptsache handelt es sich um Heizlüfter der Marke Fakir, Hobby S, die sich vom Gehäuse her wesentlich vom Heizlüfter Hobby TLB unterscheiden. Daher ist fraglich, ob Brandversuche mit diesem Modell überhaupt aussagekräftig sind.

Der Sachverständige Prader, der nach dem Ausscheiden des Sachverstānden Muhr mit der Erstellungen eines Gutachtens zur Brandursache beauftragt wurde, musste in der Hauptverhandlung einräumen, dass er zunächst irrtümlich davon ausgegangen sei, dass im Zug Heizlüfter des Modells Hobby S eingebaut waren.

*Quelle:*

- *Bild im Buch Kaprun – Dokumentation der Katastrophe am Kitzsteinhorn von Peter Obermüller, Seite 221*
- *Protokoll Hauptverhandlung v. 26.11.2003, Vernehmung Prader, Seite 69 (siehe Ordner: Protokolle der Hauptverhandlung)*


## 4.4
## Gutachten

Die zahlreichen Gutachten, die für das Österreichische Verfahren erstellt wurden, liegen der Staatsanwaltschaft Heilbronn vor. Für das vorliegende Ermittlungsverfahren dürften folgende Gutachten von Bedeutung sein:

- Schriftliches Gutachten (Brandursache) des SV Muhr, Gutachten-Nr. 1/01/GZ 1 v. 30.08.2001, beauftragt am 14.11.2000 durch die Untersuchungsrichterin Mag. Rohan-Achammer
- Schriftliches Gutachten (Untersuchung auf Ölantragungen am Heizlüfter und Lärchenholzbrettern) des SV Dr. Ackermann, DEKRA Stuttgart, Gutachten-Nr. 55073115 v. 05.09.02, beauftragt am 02.09.02 vom SV Muhr (im Auftrag des Richters Dr. Seiss)
- Schriftliches Gutachten (Untersuchung Lufthutze und deren Verpackung auf Ölantragungen) des SV Prof. Dr. Ing. Pohl v. 30.08.2003, beauftragt von der StA Salzburg, 5St213/01
- Schriftliches Gutachten (Schadhafte Heizlüfter der Marke Fakir Hobby TLB und TUB) des SV Prof. DI Maurer v. 13.10.2003, beauftragt am 26.11.2002 durch den Richter Dr. Seiss
- Schriftliches Gutachten (Brandursache und Brandentstehung) des SV Ing. Prader v. 13.10.2003, beauftragt am 13.01.2003 vom Richter Dr. Seiss
- Schriftliches Gutachten (thermometrische Untersuchung des Heizlüfters u.a.) des SV Mag. DI Geishofer v. 13.10.2003, beauftragt durch den Richter Dr. Seiss, letzte Auftragsergänzung v. 30.09.2003
- Schriftlicher Untersuchungsbefund (Überprüfung von Aufbau und Funktionsweise des Heizlüfters) des DI Thomas Lange, DEKRA Stuttgart, Mitarbeiter des SV Muhr, v. 02.08.2001, beauftragt durch den SV Muhr

*(siehe Ordner: Gutachten, Band 1 – 3)*

**5**
**Ermittlungen der Staatsanwaltschaft Heilbronn**

**5.1**
**Beschuldigte**

Alle fünf Beschuldigten wurden noch vor Ablauf der Verjährungsfrist (11.11.2005) über das gegen sie eingeleitete Ermittlungsverfahren informiert und über ihre Rechte als Beschuldigte belehrt.

- **Norbert Bischoff**

  Der Beschuldigte Bischoff wird von der Kanzlei Eisenmann, Wahle, Birk aus Stuttgart vertreten.

  In einer ersten Vernehmung am 25.10.06 äußerte sich Herr Bischoff zu seinen persönlichen Verhältnissen und seiner Tätigkeit bei der Fa. Fakir. Außerdem machte er allgemeine Angaben zum Heizlüftermodell Hobby TLB, insbesondere zu den vorliegenden VDE-Zertifikaten für dieses Modell.

  Mit Schreiben v. 27.10.05 wurde der Kanzlei ein Fragenkatalog übersandt. Die Antworten dazu gingen mit Schreiben v. 30.11.05 bei der LPD Stuttgart ein. Den Antworten waren diverse Anlagen beigefügt, u.a. VDE-Unterlagen, Produktinformationen zu verschiedenen Heizlüftermodellen und als Anlage 6 eine Übersicht der Fa. Fakir aus der hervorgeht, wer zum Zeitpunkt des Umbaus der Seilbahn verantwortliche Positionen innehatte.

  Demnach ist Herr Bischoff erst 1999 als Konstruktions- und Entwicklungsleiter beschäftigt gewesen, zuvor hatte er keine leitenden Funktionen inne.

  Aus diesem Grund dürfte Herr Bischoff für den ihm gemachten Vorwurf nicht verantwortlich sein.

  Im Antwortschreiben der Kanzlei weist Herr RA Dr. Wahle alle gegen seinen Mandanten und gegen die Fa. Fakir erhobenen Vorwürfe zurück.

- **Wolfgang Buchert**

Herr Buchert verwies bereits in einem ersten Telefonat am 20.10.05 darauf hin, dass er in den Jahren 2000-2002 nur deshalb Geschäftsführer war, weil die Banken einen zweiten Geschäftsführer verlangt hätten. Er sei kaufmännischer Leiter gewesen und habe nie etwas mit der Konstruktion oder Produktion zu tun gehabt.

Der Beschuldigte wird von der Kanzlei Berg in Mühlacker vertreten.

Herr RA Berg beantwortete mit Schreiben v. 02.11.05 einen Fragenkatalog, der am 24.10.05 an die Kanzlei geschickt wurde. Herr RA Berg weist namens seines Mandanten alle gegen diesen erhobenen Vorwürfe zurück, ebenso die Vorwürfe, die gegen die Fa. Fakir erhoben wurden.

Auf Grund er Tatsache, dass Herr Buchert lediglich von 2000-2002 kfm. Geschäftsführer war und zuvor nie eine verantwortliche Funktion bei der Fa. Fakir, insbesondere nicht im Bereich der Konstruktion oder Produktion innehatte, dürfte auch er für die ihm gemachten Vorwürfe nicht verantwortlich sein.

- **Heinz Kicherer**

  Herr Kicherer wurde am 26.10.05 über seine Rechte als Beschuldigter belehrt. Er gab an, er werde sich in diese Sache von Herrn RA Bühler, Pforzheim, vertreten lassen.

  Mit Schreiben v. 27.10.05 wurde der Kanzlei ein Fragenkatalog übersandt.

  Mit Schreiben v. 17.11.05 teilte die Kanzlei mit, dass der Fragekatalog nach vollumfänglicher Akteneinsicht beantwortet wird. Herr RA Bühler teilte mit, dass für die Verteidigung feststehen müsse, ob tatsächlich im Unglückszug zum Zeitpunkt des Unglücks ein Heizlüfter der Fa. Fakir eingebaut. war.

- **Rüdiger Kurz**

  Herr Kurz wurde am 31.10.05 nach vorausgegangenem Telefonat per Fax über die gegen ihn erhobene Vorwürfe unterrichtet und als Beschuldigter belehrt. Mit gleichem Schreiben wurde ein Fragenkatalog übermittelt.

  Für Herrn Kurz legitimierte sich Herr RA Dr. Felsinger von der Kanzlei Eisenmann, Wahle, Birk aus Stuttgart mit Schreiben v. 04.11.05, wobei die Beantwortung des Fragenkataloges zugesichert wurde.

  Mit Schreiben v. 01.12.05 übersandte RA Dr. Felsinger die Antworten zum Fragekatalog.

  Eine Verantwortlichkeit für Herrn Kurz wurde mit der Begründung verneint, dass Herr Kurz zwar vom 01.01.90-31.03.97 Geschäftsführer der Fa. Fakir gewesen sei, allerdings habe er ausschließlich für den kaufmännischen Teil die Verantwortung getragen. Für den Teil Konstruktion und Produktion sei

der Firmeneigentümer Kicherer als Geschäftsführer allein verantwortlich gewesen.

RA Dr. Felsinger wies die gegen seinen Mandanten erhobenen Vorwürfe zurück.

- **Joachim Söhn**

Nach Ermittlungen am 03.11.05 bei den jetzigen Eigentümern der Fa. Fakir war bekannt, dass die Fa. Simm für die Fa. Fakir die Gehäuseteile für den Heizlüfter Hobby TLB hergestellt hatte.
Aus dem Handelsregister des AG Karlsruhe geht hervor, dass der Beschuldigte Söhn im Produktionszeitraum 1986 – 1996 verantwortlicher Geschäftsführer war.

Herr Söhn wurde am 11.11.2005 telefonisch als Beschuldigter belehrt und über das Ermittlungsverfahren der StA Heilbronn unterrichtet.

Am gleichen Tag wurde Herrn Söhn per E-mail ein Fragenkatalog übersandt. Herr Söhn teilte noch am gleichen Tag per E-mail mit, dass er zunächst einen Anwalt befragen wolle. Er zeigte seine Verwunderung darüber, dass ein Heizlüfter, der für einen zeitlich beschränkten privaten Gebrauch in Wohnungen gedacht war, in ein Fahrzeug mit Dauerbetrieb eingebaut wurde.

Mit Schreiben v. 05.12.05 legitimierte sich Herr RA Bode aus Augsburg für Herrn Söhn und teilte mit, dass sich sein Mandant vorerst nicht zur Sache äußern werde und bat um Akteneinsicht.

*(siehe Ordner: Beschuldigte, Band 1 und 2)*


**5.2
Zeugen**

Im Verlauf des Ermittlungsverfahrens wurden zahlreiche Zeugen vernommen. Die Vernehmungen beinhalteten Fragen zum eingebauten Heizlüfter Hobby TLB, zu seiner Konstruktion und Produktion, zu seiner Wartung und zum Verbleib von diversen Beweismitteln im Zusammenhang mit der Heizlüfterproblematik.

Im Einzelnen wurden befragt:

- die in Österreich tätigen Sachverständigen Prof. Maurer, Prof. Mori, Mag. Geishofer zum Verbleib von untersuchten Einzelteilen des Heizlüfters
- der in Österreich tätige Sachverständige Muhr, der krankheitshalber aus dem österreichischen Prozess ausscheiden musste und der die Auffassung vertreten hatte, dass die unmittelbare Nähe zwischen undichter Hydraulikmessleitung und Heizlüfter eine mögliche Brandquelle war
- die Sachverständigen Lange und Dr. Ackermann von der DEKRA Stuttgart zu ihren Untersuchungen am Heizlüfter aus dem unverbrannten Zug
- der Sachverständige Hellmich von der DEKRA Dortmund zu seinen

Untersuchungen in Österreich

- der Sachverständige Prof. Dr. Pohl zu seinen Untersuchungen einer Lufthutze und eines Holzstückes aus dem Holzverbau
- der frühere Leiter des Kunststoffinstitutes der Universität Leoben, Prof. Dr. Langecker,  zu seiner Mitarbeit beim Gutachten von Prof. Maurer
- ehem. Mitarbeiter der Fa. Fakir zur Produktion und zum Modellwechsel Hobby TLB – Hobby S
- Mitarbeiter der Gletscherbahn Kaprun AG zur Frage, ob im Unglückszug tatsächlich zum Zeitpunkt des Brandes ein Hobby TLB eingebaut war und wie dieser gewartet wurde
- Beamte der KTZ Wien zu ihrer Tätigkeit im Rahmen des österreichischen Ermittlungsverfahrens
- Herr Bausch vom VDE Prüf- und Zertifizierungsinstitut zu den Prüfungen des Hobby TLB
- Herr Pfister, Geschäftsführer der Fa. Gandolff in Bern zum Stand der Technik zum Zeitpunktes des Umbaues der Gletscherbahn

*(siehe Ordner: Zeugen, Band 1 und 2)*


**5.3**
**Gutachten**

Die Staatsanwaltschaft Heilbronn beauftragte das

- Deutsche Kunststoff Institut (DKI) in Darmstadt und das
- Kriminaltechnische Institut beim Landeskriminalamt Baden-Württemberg in Stuttgart

mit Gutachten zu folgenden Fragen:

- Konstruktions- und Produktionsfehler bei der Herstellung der Kunststoffgehäuse
- Antragungen von Hydrauliköl im Gehäuseinneren des Heizlüfters Hobby TLB aus dem nicht verbrannten Zug
- Entzündungsmöglichkeit bei Abkippen der Heizeinheit

*(siehe Ordner: Eigene Gutachten)*


**6**
**Ermittlungsergebnis**

Die Ermittlungen und die Ergebnisse der beauftragten Gutachten haben keinerlei Anhaltspunkte für ein strafrechtlich relevantes Verhalten der Beschuldigten ergeben. Dieses Ermittlungsergebnis lässt sich wie folgt begründen:


**6.1**
**Positionen der Beschuldigten Buchert und Bischoff bei der Fa. Fakir**

Die Beschuldigten Buchert und Bischoff hatten zum Zeitpunkt des Umbaus der Standseilbahn durch die Fa. Svoboda in der Fa. Fakir keine verantwortlichen Positionen, aus denen eine strafrechtliche Verantwortlichkeit herzuleiten wäre.

Herr Buchert war in der Zeit von 2000-2002 Geschäftsführer für den kaufmännischen Bereich der Fa. Fakir, Herr Bischoff ist seit 1999 Verantwortlich für den Bereich Konstruktion und Entwicklung.

Der Heizlüfter Hobby TLB wurde von der Fa. Fakir von 1980 bis 1996 produziert. Für den Zeitraum 1986 bis 1996 wird eine Produktionszahl von 309092 Stück genannt.

*Quelle:*
- *Übersicht der Fa. Fakir v. 02.11.05* (siehe Ordner: Fakir)

## 6.2
## Prüfzeichen für den Heizlüfter Hobby TLB - VDE

Das Gericht in Salzburg hat festgestellt, dass der Heizlüfter Hobby TLB Prüfzeichen gem. VDE und GS aufwies. Er war nach DIN, VDE 0700 geprüft worden und entsprach somit vollinhaltlich auch den ÖVE-Bestimmungen. Der Heizlüfter verfügte über alle im Vergleichszeitraum (Oktober 1993) vorhandene Prüfzeichen und jeder der Beschuldigten konnte davon ausgehen, dass das Gerät als sicher zu betrachten war.

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seiten 92/93 (siehe Ordner: Urteil LG Salzburg)*

Der Heizlüfter Hobby TLB hat alle Prüfzeichen für die von der Fa. Fakir bestimmte Gebrauchsform erhalten, nämlich für die Verwendung als Standgerät in Wohnraum oder Badezimmer, wobei auch eine Verwendung als Wandgerät möglich war.

Tatsächlich wurde der Heizlüfter als Einbaugerät in einem Fahrzeug verwendet. Die Fa. Fakir wies in ihrer Bedienungsanleitung ausdrücklich darauf hin, dass das Gerät nicht für den Einbau in Fahrzeuge bestimmt sei. Dazu wurde das Gerät in einer Öffnung des Pultbleches eingebaut, was einer konstruktiven Änderung entsprach. Dadurch wurde u.a. die Nut- und Federwirkung der beiden Gehäuseteile aufgehoben und der Tropfwasserschutz war nicht mehr gewährleistet. Bereits durch diese Art des Einbaus hat der Heizlüfter die Gültigkeit der VDE-Prüfzeichen verloren.

*Quelle:*
- *Schriftliche Aussage Herr Bausch, VDE, v. 03.11.2005 (siehe Ordner: VDE)*
- *Schriftliche Fragen LPD Stuttgart v. 26.10.06 (siehe Ordner: VDE)*

Dadurch erfährt eine Aussage des Sachverständigen Wagner, der als gerichtlicher Sachverständiger ein Gutachten zur Hydraulikanlage abgegeben hatte, eine völlig neue und für die Verantwortlichen der Fa. Fakir eine sehr wesentliche Bedeutung.

Herr DI Wagner führte am Vormittag des 03.12.2003 bei seiner Vernehmung durch Frau StA`in Danninger-Soriat zu der Frage des Einbaus des Heizlüfters in unmittelbarer Nähe der Hydraulikmessleitungen aus:

„Dann müsste ich aber davon ausgehen, dass das Gerät nicht sach- und fachgerecht ist. Das ist nämlich die schwierige Frage. Sie bringen mich hier in eine sehr schwierige Situation. Wenn ich jetzt sage, dass eine Gefährdung vom Heizlüfter ausgeht, dann würde ich damit sagen, das Gerät ist nicht oder ist auch für einen Nichtexperten im Bereich des Brandschutzes als risikoreich zu erkennen. Unter der Voraussetzung, dass dieses Gerät als, mit den ganzen Prüfzeichen versehen, sicheres Gerät anzusehen ist, d.h. dass das Gerät selbst eigensicher ist, ist diese Ausführung sach- und fachgerecht."

*Quelle:*
- *Protokoll der Hauptverhandlung v. 03.12.2003, Vormittag, Seite 10 (siehe Ordner: Protokolle der Hauptverhandlung)*

Demnach muss jetzt davon ausgegangen werden, dass der Einbau des Heizlüfters unmittelbar vor den Hydraulikmessleitungen nicht sach- und fachgerecht erfolgte, da die für den Heizlüfter als Stand- oder Wandgerät in Wohnräumen zugeteilten VDE-Prüfzeichen auf Grund der konstruktiven Veränderungen des Heizlüfters und des Einbaus in einem Fahrzeug erloschen waren. Der Umstand, dass Prüfzeichen bei Veränderung in der Konstruktion und der Art der Anwendung ihre Gültigkeit verlieren, müsste jedem gelernten Handwerker im Elektrohandwerk bekannt sein, so auch den Elektrikern der Fa. Siemens und den Betriebselektrikern der Gletscherbahn Kaprun AG. Somit hätte es nie zu der baulichen Nähe zwischen Heizlüfter und Hydraulikmessleitungen kommen dürfen. Die Entscheidung über diese Art des Einbaus wurde nicht von Verantwortlichen der Fa. Fakir getroffen. Somit dürften sie auch nicht für die möglichen Folgen dieses Einbaus verantwortlich zu machen sein.

Gerade von Fachleuten, die, wie das Gericht immer wieder betonte, am Umbau der Bahn sowie an der Abnahme beteiligt waren, hätte man erwarten können, dass dieser Umstand festgestellt und berücksichtigt wird. Tatsächlich, so scheint es, haben sich die beteiligten Firmen und der TÜV jeweils auf die fachliche Kompetenz der anderen Firmen verlassen.

Der Betriebselektriker der Gletscherbahn Kaprun AG, Georg Kellner, hat in seiner Vernehmung am 17.05.06 ausgesagt: „Mir ist schon bekannt, dass Hersteller keine Gewährleistung übernehmen, wenn Veränderungen an einem Elektrogerät vorgenommen werden. In diesem Fall war es aber so, dass die Fa. Swoboda und die Fa. Siemens verantwortlich für die Elektroinstallationen waren. Außerdem wurde der Zug von der Genehmigungsbehörde abgenommen und ich konnte davon ausgehen, dass die Installation des Heizlüfters ordnungsgemäß erfolgt ist"

*Quelle:*

- *Vernehmung Georg Kellner am 17.05.06, Seite 3 (ON 347) (siehe Ordner: Zeugen)*

Gerade von einem Fachmann wie Herrn Kellner wäre zu erwarten gewesen, dass er diesen Punkt gegenüber seinen Vorgesetzten bei der GBK, der Fa. Swoboda oder der Fa. Siemens angesprochen hätte. Dies hat er nicht getan. Er hätte schon im Interesse der Gletscherbahn Kaprun AG die Frage der Gewährleistung ansprechen müssen, wenn ihm bekannt war, dass Veränderungen zu einem Gewährleistungsverlust führen. Er wusste, wie der Heizlüfter am Gehäuseblech montiert war und er musste wissen, dass allein durch die Art des Einbaus der Spritzwasserschutz für den Heizlüfter nicht mehr gegeben war und der Hersteller somit keine Gewährleistung übernehmen brauchte.

Das Gericht stellte zur Zulässigkeit des Heizlüftereinbaus im Urteil fest:

„Dazu kommt, dass der Heizlüfter in der Gesamtschau des Auftragsvolumens nur einen Nebenschauplatz darstellte, eine untergeordnete Rolle spielte und die beiden Beschuldigten der Fa. Swoboda sich bei der Auswahl und Einbau des Heizlüfters auf ihre fachlich geschulten Mitarbeiter der Firma verlassen konnten. Festgestellt wird ausdrücklich, dass weder die Seilbahnbedingnisse 1976 noch andere gesetzliche Vorschriften oder sonstige Normen wie etwa ÖVE-Vorschriften den Einbau eines elektrischen Heizlüfters mit Kunststoffgehäuse verbieten.
Der Einbau eines geprüften Heizlüfters war demnach damals zulässig und findet sich nicht einmal im Leitfaden „Brandschutz Seilbahnen", Ausgabe März 2003, der österreichischen Brandverhütungsstellen ein Verbot für Heizgeräte mit Kunststoffgehäuse. Der Heizlüfter Marke Fakir Hobby TLB hat zwei voneinander unabhängige Thermoschutzeinrichtungen und handelt es sich nach den am Gerät befindlichen Prüfzeichen um ein so genanntes eigensicheres Gerät."

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 91 (siehe Ordner: Urteil LG Salzburg)*

**Damit stellte das Gericht fest, dass nur ein mit Prüfzeichen versehener Heizlüfter eingebaut werden durfte.**

Herr Manfred Bausch vom VDE Prüf- und Zertifizierungsinstitut beantwortete mit Schreiben v. 03.11.2005 eine schriftliche Anfrage der LPD Stuttgart v. 26.10.2005:

**Frage LPD Stuttgart**: „Ein Gutachter kommt zu dem Ergebnis, dass sich durch den getrennten Einbau der Heizlüfterhälften mit einer Zwischenwand im Steuerpult eine neue Gerätekonstruktion ergeben habe, die eine neue VDE-Zulassung zur Folge gehabt hätte. Ist dies so richtig? Nach welchen Vorschriften hätte dann die Prüfung erfolgen müssen?"

**Antwort VDE**: „Die Aussage des Gutachters ist vollkommen richtig. Das Gerät wurde konstruktiv verändert, somit erlischt die Zeichengenehmigung. Weiterhin ist im Anwendungsbereich von DIN VDE 0700 der Hinweis: Für Geräte, die zur Verwendung in Fahrzeugen bestimmt sind, können zusätzliche Anforderungen

notwendig werden. Wie eingangs erwähnt, werden vom VDE grundsätzlich für Geräte, die zur Verwendung in Fahrzeugen bestimmt sind, keine Prüfungen vorgenommen. Insofern kann von unserer Seite keine Aussage dazu getroffen werden, wonach diese hätten überprüft werden müssen.

**Bemerkungen VDE am Anfang des Antwortschreibens**: „ … bevor wir näher zu den von Ihnen gestellten Fragen Stellung nehmen, möchten wir vorab erwähnen, dass in unserem Hause der Heizlüfter der Modellreihe Hobby TLB der Firma Fakir entsprechend deren Auftrag auf der Grundlage von Normen geprüft wurden, die für Haushaltsgeräte einschlägig sind. Die bei den Prüfungen des VDE zugrunde gelegten Normen gelten grundsätzlich nicht für Geräte, die in Fahrzeugen eingebaut werden. Darüber hinaus gelten unsere Zeichengenehmigungen nur für Geräte in der Form, wie sie zur Prüfung vorgelegen haben. Offensichtlich sind an dem ursprünglich uns zur Prüfung vorgelegten Gerät Veränderungen vorgenommen worden (Frage 10), eine Zeichengenehmigung hierfür wurde nicht erteilt.

*Quelle:*
- *Schreiben LPD Stuttgart v. 26.10.05, Ordner VDE*
- *Schreiben VDE v. 03.11.05, Seite 3, Ordner VDE*

**Der Heizlüfter Hobby TLB hätte nicht in der Standseilbahn eingebaut werden dürfen, weil die Prüfzeichen, die ihm als Wohnraumheizgerät zugeteilt wurden, keine Gültigkeit mehr hatten.**

Dieser Umstand kam im österreichischen Strafverfahren nicht zur Sprache.

### 6.3
### Fehlende Bedienungsanleitung

Nach Feststellungen des Gerichts lag den Gletscherbahnen keine Bedienungsanleitung für das Gerät Fakir Hobby TLB vor.

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 106 (siehe Ordner: Urteil LG Salzburg)*

Weiter führt das Gericht aus, dass sich eine Gebrauchsanweisung nach § 7 Elektronikverordnung (Österreich) nur an den Fachkundigen richtet.

*Quelle:*
- *Urteil LG Salzburg, Az: 37Hv60/02 d, Seite 357 (siehe Ordner: Urteil LG Salzburg)*

Wenn es tatsächlich so war, dass in insgesamt 4 Packungen mit Heizlüftern Hobby TLB, die von der Fa. Höller an die Fa. Svoboda geliefert worden sind, keine Bedienungsanleitungen vorhanden gewesen wären, so hätte spätestens dem

Elektromonteur, der das Gerät eingebaut hat auf Grund der Verpackung des Gerätes auffallen müssen, dass dieses Gerät laut der dort aufgebrachten, in roter Farbe ausgeführten Aufschrift, ausschließlich für Wohnzwecke bestimmt war. Dies ist von drei Seiten der Verpackung deutlich erkennbar. Von einem Fachkundigen wäre zu erwarten gewesen, dass ihm die unterschiedliche Anwendungsweise aufgefallen wäre und er sich zumindest bei einem weiteren Fachmann, bei einem Vorgesetzten oder auch beim Hersteller selbst über die Zulässigkeit der geplanten Verwendung erkundigt hätte.

*Quelle:*
- *Lichtbilder LPD Stuttgart von der Verpackung des Heizlüfters Glaser II (siehe Ordner: Lichtbildmappe zum Ermittlungsbericht)*

Die Wahrscheinlichkeit, dass bei 4 Heizlüftern jeweils die Bedienungsanleitungen nicht eingepackt wurden und dass diese 4 Packungen alle zur Fa. Höller nach Österreich geliefert wurden ist als äußerst unwahrscheinlich anzusehen. Nach Endmontage und technischer Prüfung der zusammengebauten Geräte werden diese verpackt, mit Garantieunterlagen und Bedienungsanleitung versehen und schließlich versiegelt. Dieses Siegel soll dem späteren Käufer dokumentieren, dass die Verpackung seit der Endmontage beim Werk nicht geöffnet wurde.

*Quelle:*
- *Aktenvermerk LPD Stuttgart v. 13.11.2006 mit Lichtbild (siehe Ordner: Fakir)*

Das Gericht stellte fest, dass den Gletscherbahnen keine Bedienungsanleitung für das Gerät Hobby TLB vorlag. Die übergebe Bedienungsanleitung für den Heizlüfter Domo sei von den Gletscherbahnen in der Elektrowerkstätte abgelegt worden.

Quelle:
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 106 (siehe Ordner: Urteil LG Salzburg)*

Bei gewissenhaft durchgeführten Revisionen durch die Betriebselektriker der Gletscherbahn Kaprun AG hätte es zumindest auffallen müssen, dass die Bedienungsanleitung für den Heizlüfter Domo nicht zu dem eingebauten Fakir Hobby TLB gepasst hat. Hier wäre zu erwarten gewesen, dass sich die Gletscherbahn Kaprun AG über den Großhändler oder beim Hersteller Fakir selbst die richtige Bedienungsanleitung besorgt.

Dann wäre möglicherweise auch der Hinweis aufgefallen, dass der Heizlüfter nicht für den Einbau in Fahrzeuge geeignet war, es wäre aufgefallen, dass auch der elektrische Anschluss nicht der Bedienungsanleitung entsprechend ausgeführt war (siehe Punkt 6 h)und die Gletscherbahn Kaprun AG hätte dafür sorgen können, dass das nicht geeignete Gerät ausgetauscht wird.

Nichts von alledem ist geschehen, obwohl die Gletscherbahn eigens

Betriebselektriker, also Fachleute beschäftigt.

## 6.4
## Selbstverlöschende Eigenschaft des Kunststoffgehäuses

Das Gericht stellte fest, dass das Kunststoffgehäuse des Heizlüfters zu brennen begonnen hat, nicht selbst verlöschte und weiter brannte. Damit wurden die in den Prüfberichten des VDE spezifizierten Eigenschaften des Heizlüfters hinsichtlich der Brandsicherheit nicht erfüllt. Eine Eigensicherheit des Kunststoffgehäuses bzw. des gesamten Heizlüfters war daher nicht gegeben.

*Quelle:*
- *Urteil LG Salzburg, Az: 37Hv60/02 d, Seite 161*


Die Ermittlungen haben ergeben, dass die Prüfung, ob ein Kunststoff schwer entflammbar ist, nach einem genau definierten Verfahren durchgeführt wird. Im Rahmen der VDE Prüfung wird der Kunststoff mit einem glühenden Draht punktiert. Der Draht ist 300 °C heiß und wird nach 30 Sekunden entfernt. Danach muss der Brand innerhalb 30 Sekunden verlöschen.

Mit Schreiben v. 06.11.1991 teilte das VDE Prüf- und Zertifizierungsinstitut der Fa. Fakir mit, dass bei einer Prüfung am 15.10.1991 das **Gehäusevorderteil** des Hobby TLB den Nadelflammtest nicht bestanden hätte. Die Nachbrenndauer habe mehr als 30 Sekunden gedauert und das abtropfende Material habe die Unterlage entzündet.

Mit Schreiben v. 06.04.92 teilte die Fa. Fakir dem VDE Prüfungs- und Zertifizierungsinstitut mit, dass das Gehäusevorderteil nunmehr aus Polyamid mit VO-Zusatz gefertigt werde.

Am 23.04.92 wurde die Brennbarkeitsprüfung wiederholt und bestanden. Die entsprechenden Prüfzeichen wurden erteilt.

Der Heizlüfter Hobby TLB war somit entsprechend den VDE-Richtlinien schwer entflammbar und in diesem Sinne eigensicher. Die erste Zeichengenehmigung für einen Hobby TLB erfolgte bereits am 12.01.1983. Die Fa. Fakir hat jeweils nach Veränderungen die erforderlichen Prüfungen durchführen lassen.

Der vom Landesgericht Salzburg verwendete Begriff „Eigensicherheit" wird im Rahmen der VDE-Prüfungen nicht benutzt.

Das Deutsche Kunststoff Institut hat in seinem Gutachten festgestellt, dass der für das **hintere Gehäuseteil** verwendete Kunststoff der höchsten Brandschutzklasse für solche Kunststoffe entspricht. Das DKI bezieht sich dabei auf die Feststellung von Prof. Maurer bzgl. der verwendeten Kunststoffe.

*Quelle:*
- *VDE-Ordner*
- *Gutachten DKI (siehe Ordner: Eigene Gutachten)*

**6.5**
**Konstruktions- und Produktionsfehler beim Hobby TLB**

**6.5.1**
**Spritzgussverfahren – Wahl des Anspritzpunktes**

Das Gericht stellte fest: „Die Wahl des Anspritzpunktes bei diesem Heizlüfter stellte einen echten und gravierenden Produktions-, aber auch Konstruktionsfehler dar."

*Quelle:*
- *Urteil LG Salzburg, Az: 37Hv60/02 d, Seite 155 (siehe Ordner: Urteil LG Salzburg)*

Ausschlaggebend für diese Feststellung waren das Gutachten der Sachverständigen Prof. Maurer und Mag. Geishofer

*Quelle:*
- *Gutachten Maurer 2 und Geishofer (siehe Ordner: Gutachten)*

Prof. Maurer kam zu dem Ergebnis, dass der sog. Befestigungsdom, an dem die Heizeinheit (Motor, Heizstern und Lüfterrad) mit 2 Schrauben verschraubt war, durch die falsche Wahl des Anspritzpunktes zur Rissbildung neigte und in der Folge tatsächlich riss.

Mag. Geishofer stellte fest, dass durch den Bruch eines oder beider Befestigungsdome die Heizeinheit abkippte und durch den geringen Abstand zwischen Heizstern und Kunststoffgehäuse – ca. 10mm – es zu einer Berührung des glühenden Heizsterns mit dem Kunststoffgehäuse gekommen sein muss, was letztendlich zur Brandauslösung geführt habe.

Bei den Ermittlungen hat sich ergeben, dass Herr Prof. Maurer kein Sachverständiger für Kunststofffragen ist. Er war als solcher nie in der österreichischen Gerichtssachverständigenliste eingetragen. Nach eigenen Angaben v. 21.11.06 hat er jedoch auf diesem Gebiet einschlägige Erfahrung, so hat er das Institut für Kunststoff der Universität Leoben mit aufgebaut.

Dennoch hat er in seinem Gutachten erwähnt, dass er Herrn Prof. Langecker, den damaligen Leiter des Instituts für Kunststoff der Universität Leoben zu Rate gezogen hat.

Dieser gab in seiner Vernehmung am 03.01.07 in Köln an, dass sich seine Feststellungen nicht auf den Heizlüfter aus dem unverbrannten Gegenzug beziehen, sondern auf ein Gehäuseteil eines Heizlüfters Hobby TUB, der ihm von Prof. Maurer zur Verfügung gestellt worden war. Er stellte bei seinen Untersuchungen einen Produktionsfehler des Gehäuses fest. Über die Einbausituation des Heizlüfters war er nicht unterrichtet. Ein Produktionsfehler

26

liegt für ihn vor, wenn ein Teil nach der Produktion ein nicht gewünschtes Eigenschaftsmerkmal, z.B. einen Riss, aufweist. Herr Prof. Langecker teilte auf Frage mit, dass die Risswachstumsgeschwindigkeit bei einem statischen Betrieb erheblich geringer als im dynamischen Betrieb sei, wobei letztendlich nicht auszuschließen sei, dass ein solcher Produktionsfehler nicht doch zum Bruch führen kann, zumal die Rotation des Lüfterrades Schwingungen im gesamten Bauteil erzeugen würde.

Die Staatsanwaltschaft Heilbronn hat das Deutsche Kunststoff Institut in Darmstadt mit der Erstellung eines Gutachtens beauftragt, ob ein Produktions- bzw. Konstruktionsfehler bei der Herstellung des Kunststoffgehäuses vorlag. Dem DKI konnten verschiedene Gehäuse Hobby TLB zur Verfügung gestellt werden, darunter auch ein Gehäuse, das im gleichen Monat wie das aus dem unverbrannten Zug ausgebaute Gerät endmontiert wurde. Eine Begutachtung der wesentlichen Teile des Originalgehäuses aus dem nicht verbrannten Zug war nicht möglich, da die von Prof. Maurer heraus präparierten Teile des Befestigungsdomes nicht mehr auffindbar waren.

Das DKI kommt in seinem Gutachten zum Ergebnis, dass bezüglich der Herstellung des Kunststoffgehäuses keine Produktionsfehler erkennbar sind und dass die Gehäuseteile sowohl vom verwendeten Kunststoff als auch von der Konstruktion dem damaligen und dem heutigen Stand der Technik entsprechen.

Wesentliche Feststellungen aus dem Gutachten sind:

- die Heizeinheit wurde mit Schrauben, die typisch für ein kunststoffgerechtes Fügen sind, am Gehäuse montiert
- Röntgen-Computertomographie und polarisierte Durchlichtmikroskopie zeigen, dass das Gefüge im Bereich des Schraubdoms sehr homogen ist. Es sind keine Fließlinien oder Anhäufungen von Pigmenten erkennen. Das Fehlen von isochromatischen Linien zeigt, dass das untersuchte Bauteil spannungsarm ist.
- Hydrauliköl löst keine weiteren Spannungsrisse aus. Bestehende Risse haben sich nur geringfügig fortgepflanzt
- der verwendete Kunststoff für die Gehäuserückseite ist ein Bayblend FR 1440, UL94 VO der Bayer AG. UL94 V0 deutet auf eine Type mit besonders guten Flammschutzeigenschaften hin. Die Klasse V0 wird für Materialien vergeben, die selbstverlöschend innerhalb von 10 Sekunden sind. Brennbare Tropfen sind nicht zulässig und ein Nachglimmen darf maximal 30 Sekunden andauern
- die Verarbeitungsqualität ist hinsichtlich der Homogenität des Materials als sehr gut zu bezeichnen. Das Bauteil ist verzugsfrei gefertigt worden. Die Qualität der Bindenähte – bis auf den Bereich der Schraubdome – kann als gut bezeichnet werden.
- Bei der Bauform der Schraublöcher ist die Lage der Risse unkritisch und kann vermutlich nicht zu einem vollständigen Bruch der Schraubdome führen. Aus diesem Grund kann die schlechte Bindenahtfestigkeit eher als ein „kosmetisches Problem" angesehen werden.
- das Bauteil weißt keine nennenswerten inneren Spannungen auf, da diese sonst im Kontakt mit einem spannungsrissauslösenden Medium zur Rissbildung geführt hätte. Auch dies ist ein Hinweis auf eine gute

Verarbeitungsqualität

- Das in diesem Bericht Maurer gezeigte Schadensbild konnte durch die in diesem Bericht beschriebenen Experimente nicht nachgestellt werden. Die Proben, die im Gutachten Maurer beschrieben wurden, lagen dem DKI nicht vor, so dass sich die Bewertung einzig auf die Abbildungen aus dem entsprechenden Gutachten stützen. Die Art des Bruchbildes (Gutachten Maurer) erinnert an Spannungsrisse gefolgt von einem Gewaltbruch. Das Bruchbild bei Spannungsrissen kann dem von Schwingungsermüdungsrissen ähneln, da es auch hier zu einem schrittweisen Rissfortschreiten kommen kann. Insbesondere wird dies häufig bei schlagzähen Materialien wie PC-ABS beobachtet.
- Gegen einen reinen Schwingungsermüdungsbruch spricht auch, dass beide Schraubdome gebrochen sind. Im Einbauzustand liegt der Lüftermotor an vier Punkten an der Gehäuserückwand an. Es ist daher unwahrscheinlich, dass es hier zum Ausfall durch Schwingung kommt.
- Aus diesen Fakten kann geschlossen werden, dass die Schraubdome des im talseitigen Führerstand verbauten Lüfters durch Spannungsrissbildung ausgefallen sind.

*Quelle:*
- *Gutachten DKI, Bericht 06T028GO v. 11.10.2006, Dr. M. Rudschuk (siehe Ordner: Eigene Gutachten)*

Durch den Umstand, dass keine Artikelnummer außer der des Heizlüfters aus dem nicht verbrannten Gegenzug bekannt ist, können auch keine Rückschlüsse auf den Produktionsmonat der Gehäuseteile und das Endmontagedatum gezogen werden. Der tatsächliche Produktionstag ist nicht nachweisbar. Die Bildung von Bindenähten hängt von den Einstellungen am Spritzgusswerkzeug ab. Temperatur des Werkzeuges, Temperatur des Granulats, Fließgeschwindigkeit und viele andere Komponenten, bestimmen letztendlich die Ausbildung von Bindenähten. Es gibt demnach keinerlei Hinweise darauf, dass im Unglückszug selbst auch ein Heizlüfter eingebaut, dessen Gehäuse so ausgeprägte Bindenähte aufweist, wie es im unverbrannten Gegenzug der Fall war. Auch das DKI hat nicht bei allen für das Erstellen des Gutachtens überlassenen Gehäuseteilen Bindenähte in ausgeprägter Form feststellen können.

Da Gehäuseteile nur miteinander verglichen werden können, wenn sie unter identischen Bedingungen produziert wurden, ist es fraglich, ob ein Schluss von den Feststellungen am Heizlüfter des nicht verbrannten Zuges auf den Heizlüfter des verunglückten Zuges zulässig ist. Möglicherweise hat der Heizlüfter im Unglückszug sichtbar keine Bindenähte aufgewiesen. Auf diese Möglichkeit sind die Sachverständigen, insbesondere die Professoren Maurer und Langecker nicht eingegangen.

**6.5.2**
**Hobby S – Neukonstruktion auf Grund erkannter Mängel beim Hobby TLB – Brände von Heizlüftern in der Vergangenheit**

Im Urteil stellt das Landesgericht Salzburg fest, dass, entgegen den Aussagen der

28

Zeugen Bischoff und Buchert, der Heizlüfter Hobby S bezüglich des Heizlüfters Hobby TLB eine völlige Neuentwicklung darstelle.

*Quelle:*

- *Urteil LG Salzburg, Az: 37Hv60/02 d, Seite 263 (siehe Ordner: Urteil LG Salzburg)*

Zur Klärung dieser Frage wurden ehemalige Mitarbeiter der Fa. Fakir vernommen. Sie sagten übereinstimmend aus, dass ihnen keine Produktions- oder Konstruktionsmängel beim Hobby TLB bekannt gewesen seien. Der Hobby S sei keine Neuentwicklung, sondern eine Anpassung des Designs gewesen. Die Technik sei gleich geblieben. Markantester Unterschied zwischen dem Hobby S und dem Hobby TLB sei, dass beim Hobby S das Gehäuse auch die Funktion eines Abstandshalters bei der Wandmontage übernommen hat.

Einer der Zeugen (Uwe Hering) war bis 1996, also über den Zeitpunkt des Zugumbaus hinaus, Leiter der Materialwirtschaft bei der Fa. Fakir und in dieser Funktion zuständig für Einkauf, Disposition und Wareneingang.
Dieser gab auch an, dass die Fa. Fakir nach Bränden in Fahrzeugen mit eingebauten Heizlüftern der Reihe Hobby TLB die Sicherheitseinrichtungen der Heizlüfter verstärkt hätte, indem ein zweiter Thermoschutzschalter eingebaut, und ein schwer entflammbarer Kunststoff mit der Bezeichnung ABS Bayblend verwendet wurde. Diese Vorfälle hätten sich vor seiner Zeit bei Fakir abgespielt. Er hatte zuvor angegeben, in der Zeit v. 01.07.89-31.12.96 bei der Fa. Fakir beschäftigt gewesen zu sein.

Der Sachverständige Muhr hatte die Erkenntnisse bezüglich der Brände in Sanitätsfahrzeugen dem Gericht in Salzburg mitgeteilt.

*Quelle:*

- *Vernehmung Uwe Hering am 30.05.06 in Stuttgart (siehe Ordner: Zeugen)*
- *Vernehmung Karl Schmid am 24.05.06 in Sternenfels (siehe Ordner: Zeugen)*
- *Vernehmungen Anton Muhr im Januar 2006 in Füssen nebst dabei übergebener Unterlagen – Schreiben v. 29.07.2002 an die Allianz Hannover mit umfangreichen schriftlichen Unterlagen (siehe Ordner: Zeugen)*

Aus diesen Unterlagen geht hervor, dass es 1992 Heizlüfter der Firmen Defa und Celix gab, die für den ständigen Gebrauch in Fahrzeugen entwickelt wurden. Es wäre demnach der Fa. Swoboda 1993/1994 möglich gewesen, die Führerstände mit speziellen Fahrzeug-Heizlüftern auszustatten. Warum dies nicht geschehen ist, kann von hier aus nicht beurteilt werden. Der Fa. Swoboda müsste bekannt gewesen sein, dass es solche Spezialheizlüfter gegeben hat.

Die Auffassung des Gerichts in Salzburg, bei den Zügen der Gletscherbahn Kaprun AG handele es sich nicht um Fahrzeuge, mag auf spezielle, in Österreich gängige Definitionen zurückzuführen sein. Nach den in Deutschland üblichen Definitionen handelte es sich bei den Zügen der Gletscherbahn Kaprun AG

eindeutig um Fahrzeuge.

*Quelle:*

- *Schreiben Vereinte Versicherungen, Herr von Daake v. 21.10.91 an Herrn Prok. Brandl von Vereinten Versicherungen (siehe Ordner: Zeugen bei Muhr, sieh Ordner: Kopien Gerichtsakten, Band 6, Reg. 40)*
- *Urteil LG Salzburg, Az: 37Hv60/02 d, 349 (siehe Ordner: Urteil LG Salzburg)*

### 6.5.3   Suche   nach   Hinweisen   auf   einen   Konstruktions-   oder Produktionsfehler bei der Fa. Fakir

Am 05.04.2006 erließ das Amtsgericht Vaihingen/Enz auf Antrag der StA Heilbronn einen Durchsuchungsbeschluss für die Firmenräume der Fa. Fakir. Die Durchsuchung sollte zum Auffinden von Unterlagen führen, die einen Hinweis auf die Existenz eines Konstruktions- bzw. Produktionsfehler beim Heizlüfter Hobby TLB enthalten und mit deren Hilfe der Nachweis zu führen sei, dass der Heizlüfter Hobby S eine vollkommene Neukonstruktion darstellt.

Der Beschluss wurde am 25.04.06 von OStA Schwarz und KHK Münch den Geschäftsführern der Fa. Fakir vorgelegt. Diese teilten mit, dass die Fa. Fakir bereit sei, alle relevanten Unterlagen der Staatsanwaltschaft Heilbronn zu übergeben, soweit solche noch vorhanden seien.

Bei einer Durchsicht der Altakten konnten 6 relevant erscheinende Leitz-Ordner mit Unterlagen zur Produktion der Gehäuseteile des Hobby TLB gefunden werden. Darin war auch Schriftverkehr zwischen den Firmen Fakir und Simm enthalten.

Eine Auswertung dieser Akten ergab keine verfahrensrelevanten Erkenntnisse, insbesondere kein Hinweis darauf, dass der Heizlüfter Hobby S eine vollkommene Neukonstruktion auf Grund erkannter Mängel beim Heizlüfter Hobby TLB war. Es fanden sich auch keinerlei Unterlagen zur Ausbildung von Bindenähten im Bereich des Befestigungsdomes.

Es kann nicht ausgeschlossen werden, dass solche Unterlagen in früheren Jahren vorhanden waren, allerdings musste die Fa. Fakir Akten aus dem Produktionsjahr 1993 längstens bis 2003 aufbewahren.

In einem Ordner fand sich eine anwendungstechnische Information der Fa. Bayer v. 15.05.1987 zur Verwendung von Bayblend – FR 1439, FR 1440 und FR 1441. (Anm.: Granulat zur Gehäuseherstellung) Dabei handelt es sich um flammgeschützte, lichtstabile Typen. Das Informationsblatt zeigt, dass bezüglich Massetemperatur, Werkzeugtemperatur und Trocknungstemperatur von der Fa. Bayer Richtwerte vorgegeben wurden, die gewisse Spielräume bieten.

Die Fa. Fakir beantwortete mit Schreiben v. 12.06.06 die im Durchsuchungsbefehl aufgelisteten Fragen. Auch aus diesem Schreiben ergaben sich keine weiteren Ermittlungsansätze.

*Quelle:*

- *Durchsuchungsbeschluss AG Vaihingen/Enz, 1Gs32/06 v. 05.04.06 (siehe Ordner: Schriftverkehr StA Heilbronn / LPD Stuttgart)*
- *Durchsuchungsbericht LPD Stuttgart v. 25.04.06 über die freiwillige Herausgabe von schriftlichen Unterlagen (siehe Ordner: Fakir)*
- *Inhalt der sichergestellten Akten (siehe Ordner: Fakir, sichergestellte Unterlagen 25.04.06)*
- *Schreiben Fa. Fakir v. 12.06.06 (siehe Ordner: Fakir)*

**6.6**
**Zustand des Heizlüfters zum Zeitpunkt der Erstellung der Gutachten Geishofer und Maurer**

**6.6.1**
**Bruch des Befestigungsdomes**

Prof. Maurer beschreibt zu Beginn seines Gutachtens den Zustand des Heizlüfters, so wie er ihn von Herrn Mag. Geishofer zur Erstellung des Gutachtens in Empfang genommen hat. Danach machte er folgende Feststellungen:

- er war nach Anlieferung teilweise zerlegt und wie in Abb. 0.1 ersichtlich die Frontabdeckung abmontiert
- in Abb. 0.2 sind alle übernommenen Teile in einer Übersicht wiedergegeben.
- Ventilatorflügel und Heizstern lagen bei der Übergabe lose im Gehäuse
- Die Befestigungsschrauben des Heizsterns waren aus der Halterung der Heizlüfter-Rückwand heraus gebrochen und lose beigelegt (siehe Abb. 03)

*Quelle:*

- *Gutachten Maurer v. 13.10.2003, Seite 2, Bilder in der Anlage (siehe Ordner: Gutachten)*

Mag. Geishofer beschreibt in seinem Gutachten den Heizlüfter folgendermaßen:

- Am 10.10.02 wurde erstmals der Heizlüfter Fakir Hobby TLB, der in dem Talführerstand des erhaltenen Wagens der Standseilbahn eingebaut war …. überprüft
- Die beiden Gehäusehälften waren nicht verschraubt.
- Die Drehknöpfe- Ein- und Ausschalter, Temperaturregler - fehlten

31

- Die Motor-Heizsterneinheit lag lose in dem Gehäuse.
- Ferner waren an der Unterseite der Rückwand, insbesondere in dem Bereich des Stromanschlusskabels, klebrige Ablagerungen erkennbar
- Der obere Befestigungsflansch war sternförmig eingerissen, der untere Flansch nicht mehr vorhanden.
- Unter der oberen Befestigungsschraube waren noch Reste des Kunststoffgehäuses eingeklemmt
- Der Heizstern selbst war an etlichen Stellen mechanisch deformiert
- Auch die ausgerissene Aufhängung der Heizsterneinheit wurde zunächst auf Schäden zurückgeführt, die im Zuge eines Transports bzw. der vorgenommenen Demontagen und Besichtigungen entstanden sein könnten.
- Mit dem Heizlüfter wurden keine weiteren Experimente vorgenommen. Insbesondere die Art der Beschädigung an dem oberen Befestigungsflansch der Heizsterneinheit gab zu denken. In Absprache mit Richter Dr. Manfred Seiss wurde der Heizlüfter der bereits in anderer Sache bestellte Gutachter Univ.-Prof. Dipl.-Ing. Dr. Maurer übergeben.

*Quelle:*

- *Gutachten Mag. Geishofer v. 13.10.2003, Seite 78-82, 88 (siehe Ordner: Gutachten)*

Die Beschreibung durch die beiden Sachverständigen offenbart eine Problematik des österreichischen Strafverfahrens.

Der beschriebene Heizlüfter wurde am 14.11. oder 15.11.2000 (Anm.: hierzu gibt es unterschiedliche Angaben seitens der KTZ und des SV Muhr) auf Weisung des Dipl.-Ing. Tisch von der KTZ Wien ausgebaut. Er wurde am 05.12.2000 bei der KTZ zerlegt und fotografiert. Diese Aufnahmen zeigen keinerlei Beschädigungen am Heizlüfter, auch nicht im Bereich des Befestigungsdomes. Die Heizeinheit ist fest an das Gehäuse geschraubt.

Dipl.-Ing. Bind erklärte bei seiner Vernehmung am 04.10.06 in Wien, dass ihm an diesem Tag keine Beschädigungen, insbesondere nicht im Bereich des Befestigungsdomes aufgefallen sein. Die Bilder in dem Gutachten Maurer konnte er nicht nachvollziehen.
Auch nach Aussagen der Sachverständigen Muhr und Lange, die den Heizlüfter im März 2001 in Besitz hatten, war der Heizlüfter unversehrt.

Frau StA Danninger-Soriat bestätigte ebenfalls, dass der Heizlüfter noch beim Ortstermin während des Prozesses im Juli 2002 in Linz unbeschädigt war.

*Quelle:*

- *Bericht LPD Stuttgart v. 06.11.2006 mit weiteren Quellenangaben (siehe Ordner: Schriftverkehr StA Heilbronn / LPD Stuttgart)*

Herr Prof. Maurer gab in seiner Vernehmung am 21.11.06 in Leoben an, er habe angenommen, dass der Zustand des Heizlüfters, so wie er ihn von Magister

Geishofer in Empfang genommen hatte, dem entsprach, wie er von der KTZ im November 2000 aus der Bahn ausgebaut worden war.

Herr Mag. Geishofer hat demnach Prof. Maurer nicht bezüglich der von ihm in seinem Gutachten niedergeschriebenen Gedanken informiert, dass die von ihm festgestellten Beschädigungen möglicherweise durch Experimente anderer Sachverständiger oder infolge der verschiedenen Transporte entstanden sein könnte.

Auf Grund dieser Feststellungen muss das Ergebnis des Gutachtens von Prof. Maurer in Frage gestellt werden, denn er ging von falschen Voraussetzungen aus. Er war der Auffassung, dass der Bruch des Befestigungsdomes noch im eingebauten Zustand erfolgt ist, was nachweislich nicht der Fall war. Die entsprechenden Bilder der KTZ lagen seit spätestens Juli 2002 vor. Hier zeigt sich, dass die im Verfahren beteiligten Sachverständigen und Kriminaltechniker untereinander nicht in einer für ein solches Verfahren erforderlichen engen Weise zusammengearbeitet, kommuniziert und sich ausgetauscht haben dürften.

Aus den Gerichtsakten des Landesgerichts Salzburg ist der exakte Weg des Heizlüfters und die damit verbundenen substantiellen Veränderungen nicht nachvollziehbar.

Zwischen dem Ausbau im November 2000 und der Übernahme des Heizlüfters durch die Sachverständigen Geishofer und Maurer liegen knapp 2 Jahre. Möglicherweise kam es infolge unsachgemäßer Behandlung zu dem von Prof. Maurer festgestellten Bruch des Befestigungsdomes. Es ist daher fraglich, ob der Bruch für das vorliegende Verfahren die ihm im österreichischen Strafverfahren zugewiesene Bedeutung haben kann. Eine zeitliche Einordnung, wann es zu dem Bruch kam, ist nicht möglich. Es kann auch nicht gesagt werden, ob die zweifellos festgestellten Mängel an den Bindenähten im Bereich des Befestigungsdomes tatsächlich ursächlich für diesen Bruch waren, was lt. Gutachten des DKI eher unwahrscheinlich ist.

*Quelle:*
- *Bericht LPD Stuttgart v. 06.11.06 (siehe Ordner: Schriftverkehr StA Heilbronn / LPD Stuttgart)*
- *Gutachten Geishofer v.13.10.03 (siehe Ordner: Gutachten)*
- *Gutachten Maurer v.13.10.03 (siehe Ordner: Gutachten*

**6.6.2**
**Mechanische Deformation des Heizsterns**

Gleiches gilt für die mechanischen Deformationen am Heizstern, wie sie von Mag. Geishofer beschrieben wurden. Auch hier ist anhand der von der KTZ im Dezember 2000 und im März 2001 von der DEKRA gemachten Aufnahmen deutlich erkennbar, dass es die beschriebenen Beschädigungen nach dem Ausbau nicht gegeben hat.

Herr Mag. Geishofer beschreibt in seinem Gutachten einen Funktionstest des ausgebauten Heizlüfters Hobby TLB aus dem nicht verbrannten Gegenzug. Er

schreibt: „ Nach dem Einschalten trat unmittelbar eine Rauchentwicklung auf, verbunden mit dem Geruch verschmorten Kunststoffes, wie aus den Überlastversuchen bereits bekannt. Außerdem konnte die Neigung der Heizsterneinheit in Richtung Rückwand beobachtet werden. Der Heizlüfter wurde sofort vom Stromnetz getrennt und anschließend zerlegt. Tatsächlich hatte sich eine provisorische Halterung gelockert, wodurch sich die Heizeinheit leicht geneigt und dadurch die Rückwand berührt hatte.“

*Quelle:*
- *Gutachten Geishofer v.13.10.03, Seiten 78-82, 87 (siehe Ordner: Gutachten)*
- *KTZ-Bilder (siehe Ordner: Lichtbildmappe zum Ermittlungsbericht)*

Leider versäumte Herr Mag. Geishofer bei der Beschreibung seines Funktionstestes zu erwähnen, dass die Berührung der Heizeinheit mit der Rückwand zwangsweise erfolgte, da der Heizstern wie beschrieben mechanisch deformiert war. Die Abbildung 38 auf Seite 81 des Gutachtens zeigt, wie stark diese Deformation ausgebildet war. Auch ein Laie vermag nun zu erkennen, dass der Normalabstand von 1 cm zwischen Heizstern und Gehäuse (mit diesem Abstandswert vom VDE geprüft und mit Prüfzeichen versehen) mit den Deformationen, die nach außen zeigen, deutlich verkleinert ist. Der Frage, warum sich die provisorische Halterung gelöst hat, wurde im Gutachten nicht nachgegangen.

In diesem Zusammenhang muss einmal mehr erwähnt werden, dass der Heizstern beim Ausbau im November 2000 die beschriebenen Deformationen nicht aufgewiesen hat. Somit haben die von Mag. Geishofer in diesem Zusammenhang getroffenen Feststellungen keine Bedeutung.

**6.7**
**Gutachten Geishofer und Maurer als Grundlage für das Urteil 1. Instanz**

Das Gericht kommt im Urteil zu dem Ergebnis, dass die Untersuchungsergebnisse der Gutachter Maurer und Geishofer den tatsächlichen Ereignissen vom 11.11.2000 am ehesten entsprechen.

Das Gericht stellte fest:

„Von diesem Schadensbild wird beim Heizlüfter im talseitigen Führerstand der Kitzsteingams ausgegangen. Diese Verkettung von Faktoren war technisch nicht berechenbar und auch nicht vorhersehbar“

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seiten 159/160 (siehe Ordner: Urteil LG Salzburg)*

Nach jetzigem Erkenntnisstand muss davon ausgegangen werden, dass beim ausgebauten Heizlüfter zum Zeitpunkt des Unglücks kein erkennbarer Bruch des

Befestigungsdomes vorhanden war. Nach Gutachten des Deutschen Kunststoff Institutes war bei der Bauform der Schraublöcher die Lage der Risse unkritisch und konnte vermutlich nicht zu einem vollständigen Bruch der Schraubdome führen.

Das von Prof. Maurer beschriebene Schadensbild konnte vom DKI Darmstadt nicht nachvollzogen werden.

*Quelle:*
- *Gutachten DKI (siehe Ordner: Eigene Gutachten)*
- *Bericht zum Zustand des Heizlüfters, LPD Stuttgart v. 06.11.2006 (Ordner: Schriftverkehr StA Heilbronn / LPD Stuttgart Band 2)*
- *Vernehmung DI Bind am 04.10.2006 beim Bezirksgericht Josefstadt, Wien, Seiten 4, 5 (siehe Ordner: Zeugen)*

Dass die beiden Sachverständigen in ihren Gutachten – unzutreffend – davon ausgegangen sind, dass der Heizlüfter bereits beim Ausbau im Nov. 2000 beschädigt gewesen sei, kam im österreichischen Verfahren nicht zur Sprache, obwohl die KTZ-Bilder vom November 2000 bekannt waren.


**6.8**
**Brandentstehung durch Abkippen der Heizeinheit nach Bruch des Befestigungsdomes**

Das Gericht geht im Urteil, den Gutachten des Mag. Geishofer und Prof. Maurer folgend, von folgender Brandentstehung aus:

„Es ist die Heizwendel eines Heizlüfters der Marke Fakir Typ Hobby TLB, wie auch im Unglückszug eingebaut, nur knapp 1,0 cm von der Rückwand entfernt.

Ausgehend von den vorstehend beschriebenen Fehlstellen im Bereich der Aufhängung des Heizsterns (Bindenähte) bildeten sich schwingungsinduzierte Ermüdungsrisse. Diese Haarrisse sind im Lauf der Zeit immer weiter fortgeschritten bis es zu einer Auseinanderklaffung im Bereich des Befestigungsflansches kam. Es bildeten sich also im Laufe der Zeit Risse im Gehäusewerkstoff des Heizlüfters (Bereich der Heizsternbefestigung) wobei nicht festgestellt werden konnte, zu welchem Zeitpunkt diese Erscheinungen erstmals auftraten, dies kann Monate oder Jahre gedauert haben.

Durch die Ermüdungsrisse wird letztlich der Befestigungsflansch eines Verschraubungspunktes soweit geschwächt, dass es in diesem Bereich zu einem Gewaltbruch, also zu einem rasch verlaufenden Bruch der Aufhängung kommt. In der Folge war es von Bedeutung, inwieweit die Befestigung der zweiten Schraube noch gegeben war. Bricht auch diese im Zuge des Bruchs des ersten Befestigungsflansches ebenfalls vollständig aus, so ist der Heizstern ohne jede Befestigung und fällt in das Gehäuse, wodurch der Ventilator augenblicklich blockiert wird, was zu einem Ansprechen der Thermoschutzscheinrichtungen und damit zu einem Abschalten der Heizleistung führt. Wie die Untersuchungen an zahlreichen Vergleichsgeräten, darunter auch Geräten der Type Hobby TLB, durch die Sachverständigen zeigten, waren an den Thermoschutzeinrichtungen keine Defekte erkennbar.

Das Gericht stellt daher fest, dass auch am Heizlüfter im talseitigen Führerstand

der Kitzsteingams die Sicherheitseinrichtungen in Ordnung waren.

War der beschriebene Schaden an der Halterung des Heizlüfters Marke Fakir Hobby TLB begrenzt und blieb die zweite Schraubenbefestigung weitgehend tragfähig, kam es nach einem Bruch der ersten Befestigungseinheit zu unkontrollierten und unvorhersehbaren Torkelbewegungen der Heizsterneinheit, wodurch eine Berührung der heißen Heizwendel mit der Gehäuserückwand möglich wurde. Die untere Verschraubung des Heizlüfters hatte noch eine Festigkeit, welche ein vollständiges Blockieren des Ventilators verhinderte. Bei einer reinen Kippbewegung nach vorne wäre eine Blockierung des Ventilators erfolgt, verbunden mit der Auslösung der zwei Thermoschutzeinrichtungen. Es traten durch den geschilderten Produktionsfehler Torkelbewegungen der gesamten Heizsterneinheit auf, verbunden mit Drehbewegungen in alle Richtungen. Durch die bauliche Nähe der Rückwand kam es auch zu einer Berührung durch den Heizstern. ….. Durch das Berühren des Heizsterns an der Rückwand des Gehäuses begann es zu brennen und zwar brannten zunächst die flüchtigen Zersetzungsprodukte des Kunststoffs. Überall dort, wo der Heizstern die Rückwand des Gehäuses berührte, zündete er es an. Eine Entzündung des Heizlüftergehäuses durch den Kontakt des Heizsterns mit der Rückwand war dadurch möglich. Die Absenkung der Lüfterdrehzahl kam dadurch zustande, dass an der Aufhängung die beschriebenen Risse wirksam wurden und der eigentliche Ventilator an dem Außenrohr schliff. Der Heizlüftermotor funktionierte einwandfrei, es erfolgte jedoch eine mechanische Behinderung. Die Senkung der Lüfterdrehzahl war durch den beschriebenen Produktionsfehler (Risse, Wahl des Anspritzpunktes) und die mechanische Behinderung des Gebläses möglich. …..

Durch die Torkelbewegung trat kein Stillstand ein, welcher die Thermoschutzeinrichtungen hätte ansprechen lassen, sondern es kam zu einer Entzündung des Heizlüftergehäuses durch den Kontakt des Heizsterns mit der Rückwand des Kunststoffgehäuses.“

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seiten 157-160 (siehe Ordner: Urteil LG Salzburg)*


Diese Brandursache konnte durch die Versuche des KTI des LKA Stuttgart nicht nachvollzogen werden.

Am 03.11.2005 wurden der LPD Stuttgart von der Fa. Fakir diverse Unterlagen übergeben, darunter zwei Expertisen des Privatgutachters Klaus Tschui aus dem Fürstentum Lichtenstein. Dieser hatte sich im Auftrag der Fa. Fakir mit den Ergebnissen der österreichischen Sachverständigen befasst und verglich diese mit den Ergebnissen von Versuchen, die von der Fa. Fakir durchgeführt wurden.

*Quelle:*
- *Aktenvermerk der LPD Stuttgart v. 03.11.05 nebst Anlagen (siehe Ordner: Fakir und Ordner: Gutachten)*

Unter Punkt 4.1.7 beschreibt Herr Tschui den Fakir Versuch 7. Bei diesem Versuch wurden beide Befestigungsdome bei einem Hobby TLB vollständig entfernt, um eine möglichst große Bewegungsfreiheit für den Heizstern zu erhalten. Auch durch sehr starkes Rütteln in verschiedenste Richtungen und

Stellungen konnte nicht erreicht werden dass der Heizstern die hinteren Ansauggitter berührte. Dies war erst durch starken Druck mittels eines Schraubendrehers möglich.

*Quelle:*
- *Expertise II, Klaus Tschui v. 21.06.2004, Bericht 2 Nr. Fak-040618, Seite 9 (siehe Ordner: Gutachten)*

Auf Anfrage v. 03.01.06 bei der Fa. Fakir erklärte diese mit Schreiben v. 05.01.06, dass es bzgl. des durchgeführten Versuches 7 keinerlei Film- oder Bildaufzeichnungen gäbe. Der Versuch könnte in Anwesenheit der Staatsanwaltschaft und der LPD Stuttgart nach Terminvereinbahrung wiederholt werden.

*Quelle:*
- *Schreiben der LPD Stuttgart an die Fa. Fakir v. 03.01.06 (siehe Ordner: Fakir)*
- *Antwortschreiben der Fa. Fakir v. 05.01.06 (siehe Ordner: Fakir)*

Der Versuch wurde am 26.01.06 im Labor der Fa. Fakir durchgeführt. Der Versuch wurde fotografisch durch die LPD Stuttgart festgehalten. Für den Versuch wurde ein Heizlüfter Hobby TLB verwendet, der im August 1991 endmontiert wurde.

Eine Berührung des Heizsterns mit dem hinteren Gehäuseteil war nur möglich, als sowohl die beiden Befestigungsdome als auch die so genannten Fixierstifte restlos abgeschliffen worden waren. Die Heizeinheit war frei beweglich und es kam zu einer Berührung zwischen Heizstern und Gehäuse.

Nachdem in einem weiteren Versuch lediglich die Befestigungsdome restlos abgeschliffen wurden, war sofort erkennbar, dass die Bewegungsfreiheit der Heizeinheit durch die noch bestehenden Fixierstifte erheblich eingeschränkt war. Nach Zusammenschrauben der beiden Gehäuseteile war es nun nicht mehr möglich, durch Rütteln in alle Richtungen eine Berührung des Heizsterns mit dem Gehäuse zu erreichen. Grund dafür war, dass das Lüfterrad sofort nach Berührung auf dem auf dem so genannten Luftströmungsrohr aufsaß und blockierte. Dadurch wurde ein weiteres Abkippen und eine weitere Annäherung des Heizsterns an das Gehäuse verhindert. Zu einer Berührung kam es nicht.

*Quelle:*
- *Aktenvermerk der LPD Stuttgart v. 26.01.06 (siehe Ordner: Fakir)*
- *Lichtbildmappe der LPD Stuttgart zu diesem Versuch v. 26.01.06 (siehe Ordner: Fakir)*

Die Staatsanwaltschaft Heilbronn entschied, dass dieser Versuch durch das Kriminaltechnische Institut des Landeskriminalamtes Baden-Württemberg wiederholt und dokumentiert werden soll.

Mit Schreiben v. 31.08.2006 legte das KTI des LKA Stuttgart sein Gutachten vor.

In der Zusammenfassung dieses Gutachtens wird ausgeführt:

„Eine beharrende Berührungsgefahr zwischen Heizstern und Gehäuserückwand und somit auch eine Brandgefahr konnte im Falle eines Abkippens der Lüfter- / Heizsterneinheit nicht festgestellt werden.

Bei einem Betrieb mit abgesenkter Lüfterdrehzahl konnte selbst bei direkter Berührung des Heizsterns an der Gehäuserückwand und erheblich verlängerten Ansprechzeiten der STBn (durch Überbrücken) (Anm: STB = Sicherheitstemperaturbegrenzer) kein Brand festgestellt werden. „Bei intakten STBn und bloßer Annäherung des Heizsterns an die Gehäuserückwand ist keinesfalls von einer Brandgefahr auszugehen."

Wenn im Innern des Heizlüfters an die Befestigungsnieten des Heizsterns Hydrauliköl gebracht wird, kann auch ohne Abkippen der Lüfter- / Heizsterneinheit, durch einen Lüfterradstillstand oder eine stark verminderte Lüfterdrehzahl, z.B. durch Verschmutzung, eine Entzündung und ein Abbrand des gesamten Lüfters entstehen.
Wenn die Lüfter- / Heizsterneinheit infolge eines vollständigen Abbrechens beider Befestigungsdome oder vollständigen Lösens beider Befestigungsschrauben abkippt, wobei das Lüfterrad blockiert und ein Lüfterflügel den Heizstern berührt, besteht bei gewöhnlich langen Ansprechzeiten der STB (von der Fa. Fakir zwischen 8 und 20 Sek. angegeben) keine Brandgefahr mit Brandübergriff auf den gesamten Lüfter .
Besitzen die STB jedoch extrem lange Ansprechzeiten (stellt möglicherweise einen Sonderfall dar), so kann eine in Brandsetzung mit Abbrand des gesamten Lüfters nicht ausgeschlossen werden."

*Quelle:*
- *Ergebnisbericht KTI / LKA BW v. 31.08.2006, Seite 22 (siehe Ordner: Eigene Gutachten)*

Diese Ergebnisse widersprechen dem vom Landesgericht Salzburg festgestellten Brandentstehungsverlauf, weil nach den Versuchsergebnissen der geringste Abstand zwischen Heizstern und Gehäuse mit 6mm festgestellt wurde.

*Quelle:*
- *Ergebnisbericht KTI / LKA BW v. 31.08.2006, Seite 18 (siehe Ordner: Eigene Gutachten)*

Die Versuche haben allerdings ergeben, dass es beim Abkippen zu einer Berührung zwischen Lüfterrad und Heizstern kommen kann. Dieser Umstand stellt aber nur dann eine Brandgefahr dar, wenn die Ansprechzeiten der Sicherheitstemperaturbegrenzer extrem lang sind. In diesem Fall wäre eine in Brandsetzung mit Abbrand des gesamten Lüfters nicht auszuschließen.

*Quelle:*
- *Ergebnisbericht KTI / LKA BW v. 31.08.2006, Seite 21 (siehe Ordner:*

*Eigene Gutachten)*

Bezüglich des Heizlüfters Hobby TLB aus dem nicht verbrannten Gegenzug hat das Gericht allerdings festgestellt, dass die Sicherheitstemperaturbegrenzer oder dort als Überhitzungsschutzschalter bezeichnet, in Ordnung waren.

„Wie die Untersuchungen an zahlreichen Vergleichsgeräten, darunter auch Geräten der Type Hobby TLB, durch die Sachverständigen zeigten, waren an den Thermoschutzeinrichtungen keine Defekte feststellbar.
Das Gericht stellt daher fest, dass auch am Heizlüfter im talseitigen Führerstand der Kitzsteingams die Sicherheitseinrichtungen in Ordnung waren."

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv 60/02 d, Seite 158 (siehe Ordner: Urteil LG Salzburg)*

## 6.9
### Belastung des Gehäuseinnern mit Hydrauliköl
Das Gericht stellte fest, dass der Heizlüfter zum Zeitpunkt des Ausbaus aus dem nicht verbrannten Gegenzug keinerlei Ölbelastung aufwies.

*Quelle:*
- *Urteil des Landesgericht Salzburg, Az: 37 Hv 60/02 d v. 19.02.2004, Seiten 119, 122, 157, 179, 209, 241, 249, 251 - (mit Verweis auf Bilder der KTZ, 252, 256, 297/303/304 - Hinweis auf Feststellungen der KTZ, 305 (siehe Ordner: Urteil LG Salzburg)*

Die hier geführten Ermittlungen haben zu Ergebnissen geführt, dass das Innere des ausgebauten Heizlüfters mit Hydrauliköl belastet war.

## 6.9.1
### Aussage des Betriebselektrikers Kellner, Gletscherbahn Kaprun AG

Am 16.07.02 sagte Georg Kellner vor Gericht aus, er habe in der linken unteren Ecke des Heizlüfters einen kleinen Ölfleck gesehen.

*Quelle:*
- *Protokoll Hauptverhandlung v. 16.07.2002, Vernehmung Georg Kellner, GBK, Seite 137 (siehe Ordner: Zeugen)*

Auf diese Aussage wurde in der Hauptverhandlung nicht weiter eingegangen.

Georg Kellner wurde am 17.05.06 in Kaprun vernommen. Er erläuterte seine

Aussage v. 16.07.02 mit folgenden Worten: „Ich glaube mich erinnern zu können, dass ich eine rötliche Flüssigkeit im Heizlüfter gesehen habe. Ich habe wegen der rötlichen Färbung geschlossen, dass es sich um Hydrauliköl handelt. Ich wusste, dass das bei der Bahn verwendete Hydrauliköl rot war. Ich habe diese Flüssigkeit nicht geprüft."

Im Rahmen dieser Vernehmung wurden dem Zeugen Kellner mehrere von der KTZ gefertigte Bilder vom Heizlüfter unmittelbar vor dem Ausbau aus dem nicht verbrannten Zug im Tunnel gezeigt. Herr Kellner gab an, die auf den Bildern deutlich sichtbare Fusselbelastung, die Abrinnspuren zwischen Heizlüfter und Luft-hutze sowie den rötlich glänzenden Fleck um den Kabeleingang damals nicht gesehen zu haben, räumte jedoch ein, dass er beim Anblick der Bilder nun spontan sagen würde, es handele sich um Öl.

Quelle:
- Vernehmung Georg Kellner am 17.05.06, Seiten 3-5, ON 347-351 (siehe Ordner: Zeugen)
- Lichtbilder KTZ:
    - LGS 17, Blatt 6, 1660396_00 V, 27.JPG
    - LGS 17, Blatt 5, Kaprun, 1660396 IX/Film 1, 18.JPG
    - LGS 17, Blatt 5, Kaprun, 1660396 IX/Film 2, 29.JPG und 30.JPG
    - LGS 17, Blatt 6, Kaprun, 1660396_oo IV, Film 2, 15.JPG
    - LGS12, Img003.JPG
    - LGS 12, Img011.JPG


Das Gericht hatte im Urteil zu diesem vom Zeugen Kellner beschriebenen Ölfleck ausgeführt: „Das Beweisverfahren hat auch ergeben, dass die geringfügigen rötlichen Farbantragungen, welche auf den Fotos der KTZ im linken unteren Eck des Heizlüfters zu sehen sind, nach den Bekundungen des Brandsachverständigen Ing. Helmut Prader ebenso gut Kondenswasser sein können, wobei dieser Sachverständige auch ausgeführt hat, dass Hinweise, dass Hydrauliköl durch den Heizlüfter durchgeronnen sein, nicht gefunden werden konnten."

Quelle:
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 298 (siehe Ordner: Urteil LG Salzburg)*


Der Sachverständige Geishofer hat im Oktober 2002 an der gleichen Stelle im Heizlüfter eine rötlich klebrige Anhaftung festgestellt, also fast 2 Jahre nach dem Unglück. Nach dieser Zeit dürfte evtl. vorhandenes Kondenswasser vollkommen verdunstet gewesen sein. Die Untersuchungen des KTI des LKA Stuttgart haben ergeben, dass im Heizlüfterinneren, genau dort, wo auf Bildern der KTZ rötliche Antragungen zu sehen sind, Rückstände von Hydrauliköl festgestellt wurden – 6 Jahre nach dem Unglück. Dazu werden später noch eingehender Bemerkungen gemacht.

Quelle:
- *Gutachten Geishofer v. 13.10.03, Seite 78 (siehe Ordner: Gutachten)*

- *Vernehmung Geishofer am 22.11.2006 beim Landesgericht Graz, Seite 4 (siehe Ordner: Zeugen)*
- *Ergebnisbericht LKA Stuttgart, KTI, v. 31.08.06 (siehe Ordner: Eigene Gutachten)*

## 6.9.2
## Bilder der KTZ vom November 2000

Das Landesgericht Salzburg übergab der Staatsanwaltschaft Heilbronn zur Durchführung des Ermittlungsverfahrens mehrere CD`s mit Bildern, die von der KTZ gefertigt wurden. Auch der Sachverständige Muhr übergab im Rahmen seiner Vernehmung in Füssen zwei Leitzordner mit Bildern, die überwiegend von der KTZ gefertigt wurden.

Auf den verschiedenen Aufnahmen, die von der KTZ teils noch im Tunnel, teils in Wien von dem Heizlüfter Hobby TLB aus dem nicht verbrannten Gegenzug gemacht wurden, sind deutlich rötlich glänzende Antragungen im Innern des Heizlüfters und an den Hydraulikölleitungen zu erkennen. Diese Antragungen waren somit bereits im November 2000 vorhanden und können daher nicht nach dem Ausbau entstanden sein.

Im Rahmen eines Rechtshilfeersuchens wurden in Wien drei KTZ-Mitarbeiter vernommen. Ihnen wurden die markantesten Bilder vorgelegt.

Herr Dipl.-Ing. Bind gab nach Vorhalt von Bildern des Heizlüfterinneren an: „Mir sind diese Antragungen nicht aufgefallen, wenn sie fotografisch dokumentiert sind, werden sie da gewesen sein. Ich habe damals nicht im Detail auf Öl geachtet."

Der damalige Aktenführer der KTZ, der Angestellte Grone, gab auf Vorhalt der Bilder an: „Ich habe die Fotos nicht begutachtet, sondern nur für den Akt gesammelt." „Ich habe ein Foto in dieser Größe nicht in Erinnerung. Auf diesem mir heute vorgezeigten Foto sind die roten Anhaftungen erkennbar. Ich kann heute nicht mehr nachvollziehen, ob diese Fotos, als ich für den Akt zuständig war, im Akt waren bzw. in dieser Größe im Akt waren."

*Quelle:*
- *Vernehmung Dipl.-Ing. Franz Bind am 04.10.06 beim Bezirksgericht Josefstadt in Wien, Seite 6 (siehe Ordner: Zeugen)*
- *Vernehmung Friedrich Grone am 12.01.07 beim Bezirksgericht Josefstadt, Wien, Seite 3 (siehe Ordner: Zeugen)*

## 6.9.3
## Hinweise auf die Verknüpfung Öl und Heizlüfter als Brandursache im Frühstadium der Ermittlungen in Österreich durch die KTZ

Die Aussage von Herrn Bind, er habe damals im Detail nicht auf Öl geachtet, steht im Widerspruch zu einer Aussage des Sachverständigen Muhr. Nach dessen

Aussage hat die KTZ bereits zu Beginn der Ermittlungen Öl in Verbindung mit dem Heizstrahler als Brandursache diskutiert.

Zitat:„ Insbesondere stört mich besonders, dass seitens der Beamten KTZ, insbesondere von Herrn Kocum und Herrn Winkler, von Anfang an von Öl in Verbindung mit dem Heizstrahler als Brandursache diskutiert wurde. Auch Grone brachte anlässlich der Besprechung vom 12.12.2000 zum Ausdruck, dass aufgrund der damaligen Erkenntnisse und Aussagen der Überlebenden von der Brandentstehung im Bereich des Heizkörpers im unteren Fahrerstand des Zuges auszugehen sei und erwähnte als weiteres wesentliches Gefahrenmoment die Hydraulikmessleitungen, welche über dem Heizkörper verlaufen. In der Hauptverhandlung wurde die Version mit dem Hydrauliköl abgeschwächt.“

*Quelle:*
- *Vernehmung Anton Muhr am 23.05.05 durch den Untersuchungsrichter Dr. Nocker des Landesgerichts Salzburg im Ermittlungsverfahren gg. Dr. Volker Edlinger, Az: 46Ur 215/03w, Seiten 8, 9 (siehe Ordner: Zeugen – Anlage zur Vernehmung des Zeugen Muhr am 10.01.06 in Füssen)*
- *Vernehmung Anton Muhr am 10.01.06 in Füssen durch LPD Stuttgart, Seite 6 (Siehe Ordner: Zeugen)*
- *Buch: Kaprun – Dokumentation der Katastrophe am Kitzsteinhorn v. Peter Obermüller, Seite 98 ab Zeile 2*

Der Inhalt dieser Aussage wurde bei Besprechungen anlässlich der Übernahme des Ermittlungsverfahrens von Frau StA`in Danninger-Soriat gegenüber Herrn OStA Schwarz von der Staatsanwaltschaft Heilbronn und mir mehrfach bestätigt.


### 6.9.4
### Untersuchungen der Innenseite des Heizlüfters auf Ölspuren im österreichischen Ermittlungsverfahren

Am 05.09.2002 erstellte Herr Dr. Roland Ackerman von der DEKRA Stuttgart ein Gutachten zur Belastung von Lärchenholzbrettern aus der Verkleidung des Heizlüfters und des Heizlüfters selbst mit Hydrauliköl. Der Auftrag zu diesem Gutachten war ihm telefonisch vom Sachverständigen Muhr namens des Landesgerichts Salzburg, Richter Dr. Seiss, erteilt worden. Der Auftrag beim Heizlüfter bezog sich ausdrücklich nur auf die Außenseite des Heizlüftergehäuses. Herr Dr. Ackermann kam in seinem Gutachten zu dem Ergebnis, dass sowohl am Lärchenholzbrett als auch auf der Rückseite des Heizlüftergehäuses Hydrauliköl nachzuweisen war. Herr Dr. Ackermann hat den Heizlüfter nicht auseinander gebaut und konnte deshalb auch keine Angaben zum Zustand der Innenseite der Gehäuseteile machen.

Auf die Frage, warum Herr Dr. Ackermann keine Problem aus den Innenseiten der Gehäuseteile untersucht hat, antworte Herr Muhr: „Das ist ein Punkt, über den ich mich sehr geärgert habe. Diese Entscheidung, nur Proben an der Außenseite zu untersuchen, hat der Richter Dr. Seiss getroffen. Dies ist für mich total unverständlich, zumal in meinem Gutachten die Möglichkeit geschildert wurde, dass Hydrauliköl ins Heizlüfterinnere gesaugt worden ist und es möglicherweise dadurch zu einer Brandauslösung gekommen sein könnte. Mit der Untersuchung

der Heizlüfterinnenseiten hätte Dr. Seiss Gewissheit gehabt, ob meine Darstellung tatsächlich möglich ist."

*Quelle:*
- *Gutachten Muhr v. 30.08.2001, eingegangen am 03.09.01 beim Landesgericht Salzburg (siehe Ordner: Gutachten)*
- *Vernehmung Anton Muhr am 10.01.06, Seiten 12/13 (siehe Ordner: Zeugen)*
- *Gutachten Dr. Ackermann, DEKRA Stuttgart, v. 05.09.2002 (siehe Ordner: Gutachten)*
- *Vernehmung Dr. Ackermann am 24.01.06, Seiten 1-3 (siehe Ordner: Zeugen)*
- *AV LPD Stuttgart v. 31.03.06 über ein Telefonat mit Dr. Ackermann v. 30.03.06 (siehe Ordner: Zeugen)*

**6.9.5**
**Feststellungen des Sachverständigen Geishofer zu Ölantragungen im Heizlüfter**

Herr Mag. Dipl.-Ing. Udo Geishofer stellte am 10.10.2002 fest, dass an der Unterseite der Rückwand, insbesondere in dem Bereich des Stromanschlusskabels, rote, klebrige Ablagerungen erkennbar waren.

Dies sind dieselben Antragungen, die bereits auf den Bildern der KTZ aus dem Tunnel vom November 2000 erkennbar waren.

In seiner Vernehmung am 22.11.06 beim Landesgericht Graz sagte Herr Geishofer, dass er die in seinem Gutachten festgestellten Anhaftungen nicht untersucht habe, dies sei nicht sein Fachgebiet gewesen. Er wisse auch nicht, ob der SV Maurer diese untersucht habe. Er habe die Klebrigkeit der Antragungen durch eine kurze Berührung festgestellt.

*Quelle:*
- *Gutachten Geishofer v. 13.10.03, Seite 78 (siehe Ordner: Gutachten)*
- *Vernehmung Geishofer am 22.11.2006 beim Landesgericht Graz, Seite 4 (siehe Ordner: Protokolle der Hauptverhandlung)*

Herr Geishofer wurde per Beschluss v. 30.09.03 vom Landesgericht Salzburg mit einem Ergänzungsgutachten beauftragt. Zu diesem Zweck wurden ihm auch alle KTZ-Unterlagen und 7 CD mit Bildern übergeben.

Auf diesen Bildern waren die von Herrn Geishofer beschriebenen rötlich klebenden Antragungen bereits im November 2000 erkennbar.

*Quelle:*
- *Gutachten Geishofer v. 13.10.03, Seite 1 (siehe Ordner: Gutachten)*

Herr Geishofer hat die Klebrigkeit der Antragung durch ein Berühren mit den Fingern geprüft. Dies hat er so in seinem Gutachten beschrieben.

**6.9.6**
**Feststellungen von Ölspuren durch den Sachverständigen Lange, DEKRA Stuttgart im Rahmen seiner Tätigkeit für den Sachverständigen Muhr – Verdunstungsverhalten von Hydrauliköl**

Das Gericht führte zu der Aussage von Dipl.-Ing. Lange, DEKRA Stuttgart, im Urteil aus:

„Dipl.-Ing. Thomas Lange stellte in einem Untersuchungsbericht vom 02.08.01 (ON 2087) dünnflüssige Ölantragungen am Gehäuse des Heizlüfters fest, wozu er in der Hauptverhandlung vom 8.1.2004 als Zeuge erklärte, diesen Befund aufgrund seiner Aufzeichnungen aus März oder April 2001 erstellt zu haben und die Feststellung dünnflüssiger Ölantragungen auf einer „Fingerprobe" beruhe, was wohl nicht ausreichend ist und wurden die vermeintlichen Ölantragungen auch deutlich mit der ergänzenden gutachterlichen Stellungsnahme der Sachverständigen Mag. Dipl.-Ing. Udo Geishofer, Ing. Helmut Prader und Dipl.-Ing. Dr. techn. Georg Wagner zum Lichtbild 154 der Beilage Gutachten Anton Muhr widerlegt (siehe ON 2316). Die Aussage des Zeugen Thomas Dipl.-Ing. Thomas Lange deutet darauf hin, dass er im April oder März 2001 offenbar auf frisch verschüttetes Öl gestoßen ist, da flüssige Bestandteile von Hydrauliköl binnen 14 Tage verdunsten, wie dies von den Sachverständigen deutlich vorgebracht worden ist."

Es fällt auf, dass die „Fingerprobe" beim Zeugen Lange vom Gericht auf Grund der Aussagen von drei Sachverständigen als unzureichend angesehen wird, während dies im schriftlichen Gutachten des Sachverständigen Geishofer v. 13.10.03 unkommentiert bleibt.

Herr Geishofer stellte im Oktober 2002 durch Fingerprobe eine Klebrigkeit der von ihm festgestellten rötlichen Antragungen im Bereich des Kabeleinganges fest, mehr als 18 Monate nach den angeblichen Feststellungen des Zeugen Lange. Die Feststellung des Zeugen Lange wird vom Gericht als unmöglich dargestellt, da nach Auffassung von drei Sachverständigen die flüssigen Bestandteile von Hydrauliköl längstens nach 14 Tagen verdunsten.

Im Büro des polizeilichen Sachbearbeiters der LPD Stuttgart wird seit 13.02.06 eine Kunststoffschale mit einigen Millilitern Hydrauliköl offen aufbewahrt. Nach mehr als einem Jahr sind die flüssigen Bestandteile immer noch nicht verdunstet. Das Fliesverhalten ist zwar zäh, aber feststellbar. Möglicherweise verdunsten die flüssigen Bestandteile bei verschiedenen Umgebungsbedingungen unterschiedlich, jedenfalls nicht innerhalb von 14 Tagen.

*Quelle:*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 305 (siehe Ordner: Urteil LG Salzburg)*

**6.9.7**
**Feststellungen der LPD Stuttgart und des KTI des LKA Stuttgart zu**

**Ölantragungen im Heizlüfterinneren**

Die unter Punkt 2 in diesem Abschnitt angesprochenen Bilder zeigen eindeutig rötlich glänzende Antragungen im Inneren des Heizlüfters, an den Hydraulikmessleitungen und sie zeigen einen rötlichen Tropfen an einem Schraubengewinde.

Nach Erhalt des Heizlüfters aus dem nicht verbrannten Gegenzug wurden von der LPD Stuttgart Lichtbilder mit einer Digital-Kamera vom Inneren des Heizlüfters gefertigt. Noch 6 Jahre nach dem Unglück sind an der Stelle, an der das Elektrokabel des Heizlüfters in das Innere des Gehäuses geführt wird, immer noch rötlich glänzende Antragungen zu erkennen, allerdings nicht mehr so intensiv wie im Jahr 2000.

Das Kriminaltechnische Institut des LKA Stuttgart wurde beauftragt, die Bereiche des Heizlüftergehäuses, in denen auf den KTZ-Bildern der ersten Stunden diese rötlichen Antragungen zu erkennen sind, auf das Vorhandensein von Hydrauliköl zu untersuchen.

Sowohl an der Außenseite als auch auf der Innenseite konnte der Nachweis einer Hydraulikölbenetzung geführt werden. Das KTI sagt dazu aus: „In den Wischproben von der Innen- und Außenseite des Heizlüfters aus dem talseitigen Führerstand des Gletscherdrachens ….. wurden gaschromtographierbare Phosphorverbindungen nachgewiesen, welche als Additive in Hydraulikflüssigkeiten verwendet werden. Diese Untersuchungsergebnisse sind nach Auffassung des Unterzeichners als Hinweis auf Rückstände von Hydraulikflüssigkeit in diesen Asservaten zu bewerten."

*Quelle:*
- *Ergebnisbericht LKA Stuttgart, KTI, v. 31.08.06, Seite 8 – der Bericht enthält Bilder der Entnahmestellen der Proben (siehe Ordner: Eigene Gutachten)*
- *Untersuchungsbericht LKA Stuttgart, KTI v. 23.11.06, Seite 6 – der Bericht enthält Bilder der Entnahmestellen der Proben (siehe Ordner: Eigene Gutachten)*
- *Bilder der KTZ (siehe Lichtbildmappe zum Ermittlungsbericht)*
- *Bilder LPD Stuttgart (siehe Lichtbildmappe zum Ermittlungsbericht)*

**6.10**
**Anschluss des Heizlüfters an das Stromnetz in der Tal- und Bergstation – Anschluss entgegen den Bestimmungen der Betriebsanleitung**

Die eingebauten Heizlüfter waren über eine Steckdose im Führerstand mit dem Stromnetz verbunden. Die Züge koppelten mit der Einfahrt in die Station über ein Kupplungsstück an das Stromnetz an, so dass der Heizlüfter während der Aufenthaltszeit in den Stationen permanent am Stromnetz angeschlossen war, soweit der Heizlüfter entweder über den Ein/Ausschalter am Heizgerät selbst oder über das Steuerpult eingeschalten war. Es war dem Fahrzeugbegleiter ohne umfangreiche Arbeiten nicht möglich, „den Stecker zu ziehen."

Dies widerspricht der Bedienungsanleitung. Hier wird gefordert: „Gerät ist nicht geeignet zum Anschluss an fest verlegten Leitungen." Eine weitere Bestimmung besagt: „Nach dem Gebrauch oder vor Reparatur- und Wartungsarbeiten Netzstecker ziehen."

*Quelle:*

- *KTZ-Akte, ON 231- 281 (siehe Ordner: Kopien Gerichtsakten – KTZ Unterlagen)*

Das KTI des LKA Stuttgart wurde auch mit elektrotechnischen Untersuchungen beauftragt. Im Ergebnisbericht steht:

„Der Grundgedanke der in diesen Heizlüftern zur Anwendung kommenden Sicherheitstemperaturbegrenzer liegt, wie auch in der Gebrauchsanweisung beschrieben, darin, dass der Heizlüfter nach einem überhitzungsbedingten Abschalten vom Inbetriebnehmer am Schalterknopf ausgeschaltet oder vom Netz getrennt werden soll. Nach Abkühlen des Geräts erfolgt dann ein selbsttätiges Wiedereinschalten des STBs. Wenn das Gerät trotz sachgemäßem Einsatz wiederholt abschaltet, soll ein Kundendienst zu Rate gezogen werden. Im Falle eines zyklischen selbsttätigen Ein- und Ausschaltens der Netzversorgung des Lüfters, wie beim Betrieb der Gletscherbahn zwangsläufig gegeben ist, kann der Schutzmechanismus des STBs nur noch in eingeschränkter Weise wirksam werden. Im Überhitzungsfall stellt diese Betriebsweise eine erhöhte Brandgefahr dar, da der STB durch diese Betriebsart zwangsläufig immer wieder zurückgestellt wird, ohne dass die Störung selbst bemerkt wird."

Dieser Umstand müsste jedem Elektriker, der mit solchen Geräten arbeitet, bekannt sein. Auch hier stellt sich die Frage, warum die Mitarbeiter der Firma Swoboda und der Gletscherbahn Kaprun AG diese Schwachstelle nicht erkannt haben, obwohl wie das Gericht festgestellt hat, nur Spezialisten und Fachleute am Werk waren.

*Quelle:*

- *Ergebnisbericht KTI LKA Stuttgart v. 31.08.06, Seite 21 (siehe Ordner: Eigene Gutachten)*

## 6.11
## Prof. Maurer – Billigprodukt, da nicht aus Metall gefertigt

Prof. Maurer gab beim Prozess an, dass es sich bei dem von ihm untersuchten Heizlüfter Hobby TLB um ein Billigprodukt handele. Auch das Nachfolgemodell Hobby S sei ein Billigprodukt. Den Gerichtsprotokollen ist nicht zu entnehmen, dass der SV Maurer nähere Erläuterungen zu seiner Feststellung machte, er wurde auch von keinem Prozessbeteiligten dazu befragt.

*Quelle:*

- *Protokoll der Hauptverhandlung v. 27.11.03, Vormittag, Seiten 19, 29 (siehe Ordner: Protokolle der Hauptverhandlung)*

Bei seiner Vernehmung durch die Staatsanwaltschaft Heilbronn machte Herr Prof. Maurer dann zu seinem Begriff „Billigprodukt" nähere Angaben: „Den Heizlüfter habe ich deshalb in der Verhandlung als „billig" bezeichnet, weil er aus Kunststoff ist. Ich habe nur den Werkstoff gemeint, die Qualität wollte ich nicht beurteilen."

Herr Prof. Maurer fügte – dies wurde vom Gericht nicht protokolliert – hinzu, dass für ihn ein Heizlüfter für den Einbau in Fahrzeugen aus Metall zu bestehen habe.

*Quelle:*
- *Vernehmung Maurer am 21.112006 beim Bezirksgericht Leoben, Seite 7 (siehe Ordner: Zeugen)*

Im Gegensatz dazu bezeichnete Herr Prof. Langecker die „analysierten Kunststoffe als hochwertige Werkstoffe, die in vielen technischen Anwendungsbereichen erfolgreich eingesetzt werden."

*Quelle:*
- *Vernehmung Langecker  am 03.01.07 in Köln, Seite 3 (siehe Ordner Zeugen)*

**6.12**
**Stand der Technik zum Zeitpunkt des Umbaus der Züge**

Nach Feststellung des Gericht entsprach der Umbau bezüglich der angewandten Technik und der benutzten Materialien dem damaligen Stand der Technik Entgegenstehende gesetzliche Vorschriften oder Normen habe es nicht gegeben..

Ein für die Versicherung der Fa. Fakir tätiger Sachverständiger, Dipl.-Ing. (FH) Hans-Joachim Keim, Fa. Keimkonzept Stuttgart, führt in seinem Gutachten II v. 16.12.05 an, dass durch die Fa. Gangloff in Bern bereits Ende der 80er Jahre viel weitgehender Standards beim Bau von Standseilbahnen üblich waren, als dies beim Umbau der Kapruner Gletscherbahn der Fall war.

Am 15.01.07 wurde in Bern beim Untersuchungsrichteramt III der Geschäftsführer der Fa. Gangloff AG, Herr Marc Pfister, vernommen.

Er wurde mit dem Inhalt des Gutachtens von Herrn Keim konfrontiert und bestätigte dessen Angaben aus dem Gutachten. Danach gab es bereits im Jahre 1988 Verträge der Fa. Gangloff mit Seilbahnbetreibern aus Frankreich, bei denen Brandverhütung eine Rolle gespielt hat und in denen es genaue Vorschriften über die zu verwendenden Materialien gab. Die dort vertraglich festgehaltenen Details gehen weit über das hinaus, was die Gletscherbahn Kaprun AG an Sicherheitsvorkehrungen in ihre Standseilbahn eingebaut hat.

Herr Pfister gab an, dass die Fa. Gangloff noch nie Wohnraumheizlüfter in

Fahrzeuge eingebaut habe, es kämen ausschließlich fahrzeuggeeignete Heizgeräte zum Einsatz.

*Quelle:*
- *Gutachten II, Keimkonzept v. 16.12.05, Auftragsnummer 2168005, ab Seite 5ff*
- *Urteil LG Salzburg, Az: 37 Hv60/02 d, Seite 231 (siehe Ordner: Urteil LG Salzburg)*
- *Vernehmung Marc Pfister am 15.01.07 in Bern, Seite 2 (siehe Ordner: Zeugen)*

Der bereits im Gerichtsverfahren tätige Sachverständige Klaus Hellmich, DEKRA Dortmund, wurde am 05.04.06 in Dortmund zum Sachverhalt vernommen. Er gab unter anderem an: "Es gab zum Zeitpunkt des Umbaus der Bahn in Österreich keine speziellen Vorschriften, die sich mit Standseilbahnen beschäftigten. Es wurde meiner Auffassung nach beim Umbau gegen die allgemeinen Regeln der Technik verstoßen, auch dies ist aus dem Gutachten (gemeint sein eigenes Gutachten) zu entnehmen. Die wichtigsten Punkte sind: "Unmittelbare Nähe zwischen Heizlüfter als möglicher Zündquelle, den dahinter verlaufenden und unter hohem Druck stehenden Ölleitungen sowie des Holzeinbaus, die Verwendung von GFK (Glasfaserverstärkter Kohlenstoff) statt des genehmigten Aluminiums, fehlende Öffnungsmöglichkeiten der Türen für die Passagiere, fehlende Brandbekämpfungsmöglichkeiten für Passagiere, fehlende Kommunikationsmöglichkeit zwischen Passagieren und Betriebspersonal u.a."

*Quelle:*
- *Vernehmung Hellmich am 05.04.07, Seite 6 (siehe Ordner: Zeugen)*

Die von Herrn Hellmich angesprochenen Punkte waren für die Fa. Gangloff schon viele Jahre vor dem Umbau Standard.

*Quelle:*
- *Vernehmung Marc Pfister am 15.01.07 in Bern (siehe Ordner: Zeugen)*
- *Gutachten Keimkonzept v. 16.12.05, Seiten 5 ff*

**6.13**
**Jährliche Revisionen des Heizlüfters**

Das LG Salzburg stellte fest, dass die Wartungsarbeiten an den eingebauten Fakir-Heizlüftern ordnungsgemäß jährlich durchgeführt wurden.

Die Vernehmung des Betriebselektrikers Kellner von der Gletscherbahn Kaprun AG hat hierzu ergeben:

- "Die Heizlüfter wurden in der Hauptrevision durch die betriebseigenen Elektriker gewartet. Die Hauptrevision wurde in der Regel jährlich im Sommer auf Weisung des Betriebsleiters durchgeführt."
- "Es wurde eine Funktionskontrolle durchgeführt. Es wurde darauf geachtet,

ob man beim Betrieb ein auffälliges Geräusch hört. Ansonsten wurden augenscheinliche Kontrollen durchgeführt."

- Auf Frage, ob zu Wartungszwecken je das vordere Gehäuseteil entfernt wurde: „Nein"
- Auf Frage, wie er feststellen konnte, dass das Innere des Heizlüfters verschmutzt war: „Wenn man von außen durch das Gitter schaute, hat man gesehen, ob das Gerät verschmutzt war.
- Auf Frage, wie er durch das Lüfterrad hindurch sehen konnte, ob sich dahinter Schmutz angesammelt hat: „Der Heizlüfter wurde ausschließlich von vorne kontrolliert. Es wurde mit einer Taschenlampe ins Innere hinein geleuchtet."

Angesichtes der Bilder, die die KTZ im November 2000 vom Inneren des Heizlüfters nach Abnahme des Gehäusevorderteils und später im Labor gefertigt hat, bleibt der Gedanke nicht aus, dass zumindest die Ölbelastung im Inneren des Heizlüfters bei den Revisionsarbeit feststellbar gewesen wäre.

Es wäre ohne großen Aufwand möglich gewesen, den Heizlüfter auseinander zu schrauben und eine ausführliche Sichtkontrolle durchzuführen.

*Quelle:*

- *Vernehmung Georg Kellner am 17.05.06 in Kaprun,  Seite 2 , ON 345 (siehe Ordner: Zeugen)*

Der Betriebselektriker Rudolf Schlosser bestätigte die Angaben von Herrn Kellner.

Er machte ergänzend folgende Angaben:

- Auf Frage, warum das vordere Gehäuseteil zu Wartungszwecken nicht entfernt wurde: „Das wurde von uns nicht für notwendig gehalten. So schmutzig waren die nie."
- Auf Frage, wann die Heizlüfter gewartet wurden: „Bei der jährlichen Revision. Ich habe die Heizlüfter, wenn sie mir schmutzig vorkamen, ausgeblasen."
- Auf Frage, wie er feststellen konnte, ob hinter dem Lüferrad Verschmutzungen waren: „Ich gehe davon aus, dass diese Verschmutzungen auch weggeblasen wurden."

*Quelle:*

- *Vernehmung Rudolf Schlosser am 17.05.06 in Kaprun, Seite 2,ON 355 (siehe Ordner: Zeugen)*


**7**
**Zusammenfassung**

Am 11.11.2000 starben 155 Menschen an den Folgen eines Brandes, der im talseitigen Führerstand der bergwärts fahrenden Standseilbahn entstanden war.

Lediglich 12 Passagiere konnten sich retten.

Die Staatsanwaltschaft Salzburg klagte nach Abschluss der Ermittlungen insgesamt 16 Personen – Verantwortliche der Gletscherbahn Kaprun AG, der am Umbau 1993/1994 beteiligten Firmen, der Genehmigungsbehörde und des zuständigen TÜV wegen fahrl. Herbeiführung einer Feuersbrunst an.

Alle Angeklagten wurden freigesprochen. Der Freispruch wurde vom Oberlandesgericht Linz bestätigt.

Das Gericht in Salzburg kam zu dem Ergebnis, dass der Brandausbruch einen unmittelbaren Zusammenhang mit einem im Führerstand eingebauten Wohnraum-Heizlüfter der Fa. Fakir vom Typ Hobby TLB aufwies. Vom Gericht beauftragte Sachverständige kamen zu dem Ergebnis, dass der mit allen Prüfzeichen versehene und somit als eigensicher geltende Heizlüfter infolge von Produktions- und Konstruktionsfehlern, die der Hersteller Fakir zu verantworten hatte, in Brand geriet. Durch die falsche Wahl des so genannten Anspritzpunktes wiesen die hinteren Gehäuseteile des Heizlüfters Bindenähte auf. Diese Bindenähte stellen einen Schwachpunkt dar. Infolge dieser Schwächung kam es im laufenden Betrieb zu Rissbildungen und letztendlich zum Bruch des Befestigungsdomes. Hier sind der Elektromotor, der Heizstern und das Lüfterrad durch zwei Schrauben mit dem Gehäuse verbunden. Durch den Bruch kippte die komplette Heizeinheit ab und es kam zu einer Berührung des glühenden Heizsterns mit dem Kunststoff des Gehäuses. Da der Kunststoff keine selbst verlöschenden Eigenschaften aufwies, entwickelte sich der Brand. Die dadurch entstandene Hitze brachte die unmittelbar hinter dem Heizlüfter verlaufenden Hydraulikmessleitungen, die unter einem sehr hohen Druck standen, zum Platzen, was letztendlich zur explosionsartigen Ausbreitung des Brandes führte.

Zu Beginn des Prozesses war ein weiterer Sachverständiger, Herr Anton Muhr, beteiligt, der in seinem schriftlichen Gutachten von einer anderen Brandursache ausging. Für ihn lag die Ursache in der nicht zu verantwortbaren Nähe zwischen Heizlüfter und einer unmittelbar hinter dem Heizlüfter verlegten Messleitungen, die Undichtigkeiten aufwies. Infolge der Art des Einbaus des Heizlüfters – Gehäusevorderseite und Rückseite wurden auf ein Aluminiumblech im Führerstand aufgeschraubt - wurde die Dichtigkeit des Heizlüftergehäuses aufgehoben, Hydrauliköl gelangte mit anderen Partikeln in das Innere des Heizlüfters und entzündete sich dann zu einem nicht näher bestimmbaren Zeitpunkt.

Herr Muhr schied aus dem Prozess aus, bevor er das Ergebnis seiner Arbeit in den Prozess einbringen konnte. Er wurde auf Anordnung des Gerichts psychiatrisch untersucht und konnte in der Folge krankheitsbedingt am Prozess nicht mehr teilnehmen, weswegen ein neuer Sachverständiger mit einem Gutachten zur Brandursache beauftragt wurde.

Auf Grund des Prozessergebnisses erstattete die Gletscherbahn Kaprun AG Strafanzeige gegen die Verantwortlichen der Fa. Fakir wegen Verdachts der fahrlässigen Brandstiftung und fahrl. Tötung in 155 Fällen.

Dieses Ermittlungsverfahren wurde auf Ersuchen der Staatsanwaltschaft Salzburg von der Staatsanwaltschaft Heilbronn übernommen. Mit den Ermittlungen wurde bei der Landespolizeidirektion Stuttgart das Dezernat S/OK beauftragt.

Das Ergebnis dieser Ermittlungen unterscheidet sich in wesentlichen Punkten vom Ergebnis des Österreichischen Strafverfahrens.

Danach kann den Verantwortlichen der Fa. Fakir sowie der Fa. Simm – zuständig für die Herstellung der Kunststoffgehäuse – kein strafrechtlich relevanter Vorwurf gemacht werden.

**Begründung:**

Der von der Fa. Swoboda im Auftrag der Gletscherbahn Kaprun AG eingebaute Heizlüftertyp Hobby TLB war von der Fa. Fakir als Heizlüfter für Wohnraum und Bad entwickelt, hergestellt und zu diesem Zweck auch zu den erforderlichen Zulassungsprüfungen beim VDE vorgestellt worden.

Der Heizlüfter Hobby TLB hat alle Prüfungen beim VDE erfüllt, die Gehäuseteile waren aus hochwertigem Kunststoff gefertigt, das hintere Gehäuseteil, an dem die Heizeinheit montiert war, wies selbst verlöschende Eigenschaften im Sinne der VDE-Richtlinien auf.

Die Prüfzeichen und die Zulassung des Heizlüfters Hobby TLB ging in dem Moment verloren, als die Fa. Swoboda beim Einbau in das Aluminiumblech des Führerstandes eine konstruktive Änderung vornahm. Jede konstruktive Änderung führt zum sofortigen Erlöschen der Zulassung. Das Heizgerät verlor auch seine Zulassung, weil es nicht bestimmungsgemäß betrieben wurde, um einen Wohnraum oder ein Bad zu heizen, sondern den Führerstand einer Standseilbahn, also eines Fahrzeuges.

Die Firma Fakir hat in der Betriebsanleitung für das Gerät darauf hingewiesen, dass ein Einbau in Fahrzeugen nicht zulässig sei.

Weiter wird in der Betriebsanleitung darauf hingewiesen, dass ein permanenter Anschluss ans Stromnetz nicht der geeignete Anschluss sei. Diese Empfehlung wurde missachtet. Die Wagenbegleiter hatten nicht die Möglichkeit, den Stecker zu ziehen; dadurch war die volle Schutzwirkung der Thermostate nicht mehr gegeben.

Der Prozess in Österreich hat ergeben, dass ausschließlich Spezialisten und Fachleute beim Umbau der Standseilbahn beteiligt waren, die Verantwortlichen der beteiligten Firmen durften sich auf ihre Fachleute verlassen. Die Tatsache, dass die Fa. Fakir darauf hinwies, dass Heizlüfter des Typs Hobby TLB nicht in Fahrzeuge eingebaut werden durfte, sei den am Umbau beteiligten Personen nicht bekannt gewesen, da die Bedienungsanleitung nicht vorlag.

Selbst wenn dies der Fall gewesen wäre, hätte man von Spezialisten und Fachleuten erwarten können, dass sie wussten, dass konstruktive Änderungen und bestimmungswidriger Gebrauch zum Verlust von Prüfzeichen und Zulassungszeichen führen, dies ist in Österreich genau so der Fall wie in Deutschland.

Auch aus der Verpackung der Fa. Fakir hätte ein Fachmann entnehmen können,

dass der Heizlüfter nur für Wohnraum und Bad und nicht für den Einbau in ein Fahrzeug bestimmt war.

Spätestens die Betriebselektriker der Gletscherbahn Kaprun AG – ebenso ausgewiesenen Spezialisten und Fachleuten – hätten erkennen müssen, dass es sich um einen Heizlüfter gehandelt hat, der konstruktiv verändert und bestimmungswidrig eingesetzt wurde und somit nicht eingebaut und betrieben werden durfte.

Es wäre der Gletscherbahn Kaprun AG auch möglich gewesen, sich bei der Fa. Fakir die entsprechende Bedienungsanleitung zu beschaffen. Spätestens danach hätte man die Heizlüfter gegen Geräte tauschen können, die für den Einbau in Fahrzeuge geeignet und zugelassen waren. Der Markt hat zum Zeitpunkt des Umbaus solche Geräte angeboten; der SV Muhr hat solche Geräte sogar beschafft. Sie lagen dem Landesgericht Salzburg als Beweismittel vor.

Nach dem schriftlichen Gutachten des Dipl-Ing. Hellmich, DEKRA Dortmund, das dieser für das österreichische Verfahren verfasst hat, wurde beim Einbau des Heizlüfters gegen die allgemeinen Regeln der Technik verstoßen.

Der Sachverständige Muhr hatte von Beginn der Ermittlungen an die Möglichkeit erörtert, dass Hydrauliköl aus den undichten Messleitungen in das Heizlüfterinnere gelangt ist und sich dort entzündet haben könnte. Auch die KTZ Wien hat diese Möglichkeit bereits im Dezember 2000 bei Besprechungen in Wien angesprochen, was auch von der Staatsanwaltschaft Salzburg so bestätigt wurde. Im Prozess selbst wurden diese Äußerungen seitens der KTZ-Mitarbeiter abgestritten.

Tatsächlich gab es bereits sehr früh Anzeichen dafür, dass die Brandkatastrophe auf das Zusammentreffen von Öl und Heizlüfter zurückzuführen ist. Diese Anzeichen ergaben sich aus der Untersuchung des nicht verbrannten Gegenzuges. Am Unglückszug selbst war infolge der Brandeinwirkung keinerlei verwertbare Spuren mehr sichern. Es konnte nicht einmal der Heizstern des eingebauten Heizlüfters Hobby TLB gefunden werden. Dies verwundert, da der Heizstern des im bergseitigen Führerstand eingebauten Heizlüfters der Marke Stiebel Eltron gefunden werden konnte.

Folgende Anzeichen sprechen für die Richtigkeit des Gutachtens des Sachverständigen Muhr:

- der Betriebselektriker Kellner der Gletscherbahn Kaprun AG hat bereits im Tunnel geringe Ölspuren im Heizlüfterinnere des Hobby TLB gesehen
- zahlreiche Fotos der KTZ Wien vom November 2000 zeigen deutliche rötlich glänzende Antragungen im Gehäuseinneren und auf der Außenseite des Heizlüfters
- diese Bilder zeigen auch rötlich glänzende Antragungen an den Hydraulikmessleitungen
- die Bilder zeigen auch deutliche „Fusselantragungen" im Bereich des Lüfterrades und des Elektromotors. Diese Antragungen wären frühzeitig erkennbar gewesen, wenn sich die Betriebselektriker der Gletscherbahn Kaprun AG nicht auf visuelle Prüfungen beschränkt hätten. Die Fussel und die Ölanhaftungen wären erkannt worden, wenn der Heizlüfter für die

Wartungsarbeiten auseinander gebaut worden wäre.

- ab März 2001 im Rahmen der Untersuchungen in der so genannten Vabio-Halle in Linz von DEKRA Mitarbeitern festgestellte Ölantragungen im Gehäuseinneren werden zwar vom Gericht als gegeben hingenommen, jedoch wird die Existenz der rötlich klebrigen Antragungen mit Untersuchungen in der Vabio-Halle begründet
- das Deutsche Kunststoff Institut Darmstadt kommt in seinem Gutachten zum Ergebnis, dass die Wahl des Anspritzpunktes tatsächlich zu bemängeln ist, allerdings habe dies lediglich „kosmetische" Auswirkungen. Das Institut konnte das von Prof. Maurer festgestellte Schadensbild nicht nachvollziehen
- das Kriminaltechnische Institut des Landeskriminalamts Baden-Württemberg konnte in vielen Versuchen nachweisen, dass die vom Gericht in Salzburg als erwiesen dargestellte Brandentstehung durch Abkippen der Heizeinheit so nicht stattgefunden haben kann, da es nicht zu einer Berührung der Heizeinheit mit dem Kunststoffgehäuse kommt – trotz eines geringen Abstandes von Heizstern zum Gehäuse von ca. 10mm
- das KTI hat weiter nachgewiesen, dass es durchaus zur Brandentstehung kommen kann, wenn Hydrauliköl ins Heizlüfterinnere gelangen kann, was bei der Art des Einbaus durch den aufgehobenen Spritzwasserschutz möglich war. Es konnten Hinweis auf Hydrauliköl im Inneren des Gehäuses gefunden werden.

- das KTI hat weiter festgestellt, dass ein Brand ohne Hydraulikölbelastung nur in dem seltenen Fall entstehen kann, wenn einer der beiden eingebauten Überhitzungsschutzschalter außergewöhnlich lange Ansprechzeiten aufweist. Diese Schutzschalter waren aber nach Überzeugung des Gerichts in Salzburg in einem einwandfreien Zustand
- durch die Art des Einbaus war der Spritzwasserschutz des Gehäuses aufgehoben – es konnte Öl bei undichten Hydraulikleitungen ins Heizlüfterinnere gelangen (von KTI LKA Stuttgart bestätigt)

Zu berücksichtigen ist weiter, dass die Gutachten, die nach hiesiger Auffassung letztendlich zum Freispruch geführt haben, von unzutreffenden Voraussetzungen ausgingen. Die vom SV Maurer beschriebenen Beschädigungen, insbesondere das abgebrochene Kunststoffteil am Befestigungsdom, sind erst im Jahr 2002 entstanden, wobei unklar ist, wodurch.

Die Ermittlungen der Staatsanwaltschaft Heilbronn wurden erschwert, weil die wesentlichen Beweismittel, auf die sich letztendlich der Freispruch bezogen hat, für das deutsche Verfahren nicht zur Verfügung gestellt werden konnten. Dabei handelte es sich um folgende Gegenstände:

- vom SV Maurer aus der Gehäuserückseite herauspräparierter Befestigungsdom
- von den SV Geishofer und Maurer festgestelltes Bruchstück an einer Befestigungsschraube

- Teile eines Vergleichsheizlüfters, im österreichischen Verfahren mit „Glaser alt" bezeichnet
- Teile der Holzverkleidung – genau das Brett, das bereits auf ersten Fotos der KTZ rötliche Antragungen aufwies

Im Verfahren der Staatsanwaltschaft Heilbronn wurden auch drei Mitarbeiter der KTZ Wien in einem Rechtshilfeverfahren in Wien beim zuständigen Bezirksgericht vernommen. Während zwei in Kaprun tätige Ingenieure eine uneingeschränkte Aussagegenehmigung erhielten, wurde die Aussagegenehmigung für den damaligen Aktenführers Grone derart eingeschränkt, dass er nur noch eigene Wahrnehmungen angeben durfte.

Insofern war auch im Verfahren der Staatsanwaltschaft Heilbronn nicht zu klären, welche Feststellungen von der KTZ tatsächlich getroffen wurden, warum die Arbeiten letztendlich einfach eingestellt wurden und warum es nur zu einem fünfseitigen Bericht gekommen ist.

Als Ergebnis der Ermittlungen lässt sich feststellen, dass sich das Unglück am 11.11.2000 hätte vermeiden lassen können, wenn seitens der Fa. Swoboda fahrzeuggeeignete Heizlüfter eingebaut worden wären, die es auf dem Markt gab.

Die Verantwortlichen der Fa. Fakir und Simm haben die Heizlüfter Hobby TLB weder für den Einbau in Fahrzeuge entwickelt bzw. produziert, noch dafür empfohlen. Sie haben durch die Ausgestaltung der Verpackung und den Inhalt der beigefügten Bedienungsanleitung darauf aufmerksam gemacht, dass der Heizlüfter für den Einbau in Fahrzeuge ungeeignet und nicht dafür vorgesehen war. Sie haben die Sicherheit des Heizlüfters ständig überprüft und weiterentwickelt und dafür beim VDE die entsprechenden Prüfungen abgelegt.

Niemand von den hier beschuldigen Personen konnte wissen,

- dass ein Einbau in die Seilbahn geplant war.
- dass der Heizlüfter zum Einbau konstruktiv verändert wurde
- dass durch diese Änderung der Spritzwasserschutz aufgehoben wurde
- dass der Anschluss an das Stromnetz in bedenklicher Weise erfolgte und
- dass unmittelbar hinter dem Heizlüfter Hydraulikmessleitungen verlegt wurden

Den Beschuldigten kann weder bezüglich der Brandentstehung noch wegen des Verlaufs der Brandkatastrophe und dem damit verbundenen Tod von 155 Personen irgendein Vorwurf gemacht werden.

Zum Zeitpunkt der Anklage in Österreich waren die Vorwürfe wegen eines angeblichen Produktions- oder Konstruktionsfehlers beim Heizlüfter Hobby TLB noch nicht erhoben worden. Wäre dies der Fall gewesen, wären möglicherweise beim Prozess auch Verantwortliche der Fa. Fakir angeklagt worden. In diesem Fall wäre bereits im Prozess vorgebracht worden, dass die Heizlüfter bestimmungswidrig und damit ohne erforderliche Prüfzeichen eingebaut und betrieben wurden.

Somit wäre ein anderer Ausgang des Prozesses zu erwarten gewesen.

Jürgen Münch
Kriminalhauptkommissar

**Anlage zum Ermittlungsbericht:  Ordner mit Lichtbildern**